294 F.2d 385
 UNITED STATES of America, Plaintiff-Appellee,
v.
NATIONAL MARINE ENGINEERS' BENEFICIAL ASSOCIATION, Seafarers
International Union of North America, and
International Organization of Masters,
Mates and Pilots, Defendants-Appellants.
 No. 428, Docket 27082.
 United States Court of Appeals Second Circuit.
 Argued Aug. 17, 1961.
Decided Aug. 22, 1961.
 
 Lee Pressman, New York City (Lee Pressman, New York City, Richard Markowitz, Philadelphia, Pa., Ned R. Phillips, New York City, of counsel), for appellant, National Marine Engineers' Beneficial Assn.
 Richard H. Markowitz, Philadelphia, Pa., for appellant, Seafarers Intern. Union of North America.
 Betty H. Olchin, New York City (Marvin Schwartz, Betty H. Olchin, New York City, Donald E. Klein, New York City, of counsel), for appellant, Intern. Organization of Masters, Mates and Pilots.
 William H. Orrick, Jr., Asst. Atty. Gen. (Robert M. Morgenthau, U.S. Atty., New York City, Alan S. Rosenthal, Pauline B. Heller, W. Harold Bigham, Edward A. Groobert, Attys., Dept. of Justice), Washington, D.C., for appellee.
 Before MOORE, FRIENDLY and SMITH, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 National Marine Engineers' Beneficial Association, AFL-CIO (MEBA), International Organization of Masters, Mates and Pilots (MMP) and Seafarers International Union of North America (SIU) appeal from an order of Chief Judge Ryan, entered in the District Court for the Southern District of New York on July 10, 1961, pursuant to 208 of the Labor Management Relations Act of 1947, 61 Stat. 155, 29 U.S.C.A. 178 (sometimes hereafter the Taft-Hartley Act or the Act), which temporarily enjoined continuation of a large scale strike of the United States merchant marine. Other unions which were defendants below and were named in the injunction have not appealed. It is not disputed that all the preliminary steps to such an injunction required by 206-208 of the Act, 29 U.S.C.A. 176-178-- Presidential appointment of a board of inquiry, the making and filing of a report by the board, and direction by the President to the Attorney General to start a suit-- were duly taken. The District Court found that the strike affected a substantial part of an industry engaged in transportation among the several states and with foreign nations and that, if permitted to continue, it would imperil the national health and safety. Although the parties differ slightly as to the number of vessels in the United States merchant fleet and the proportion that would have been immobilized by the strike at the time of the injunction but for a temporary restraining order issued by the District Court on July 3,[1] we need not discuss this since the lowest percentage claimed, 45 1/2%,[2] is plainly 'a substantial part,'[3] and appellants do not here contend to the contrary.
 
 
 2
 However, the parties are in sharp conflict whether the District Court was warranted in finding that continuance of the strike 'will imperil the national health or safety,' a finding which 208(a)(ii) makes indispensable to the issuance of the injunction. Here, as in United Steelworkers of America v. United States, 1959, 361 U.S. 39, 80 S.Ct. 1, 177, 4 L.Ed.2d 12, 169, the Government urges a broadly inclusive interpretation of these words of the statute whereas the appellant unions claim that 'health' is limited to the physical health of the populace as distinguished from the general well-being of the nation and its economy, and that 'safety' is limited to the national defense and even that viewed on a somewhat restricted basis. The question of what these terms embody is not without its difficulties, and Congressional clarification of so important a matter would surely be helpful. Like the Supreme Court in the Steelworkers case, we find it unnecessary to resolve the issue. For the record supports the granting of the injunction even on the narrower interpretation of the statutory language for which the unions contend.[4]
 
 
 3
 The District Court found that continuation of the strike 'would have an adverse effect upon the maintenance in this country of an adequate supply of petroleum products, which is essential to transportation, both military and civilian, and for the operation of industrial plants and electric utilities and for heating.' There is no need to belabor the point that a material depletion of petroleum supply would imperil the national health and safety even on the most restricted interpretation of those terms. Without going into burdensome detail, it is evident that a supply of petroleum products adequate for the production and transportation of foods and drugs, for heating, for the making of electrical energy, and for many other purposes, is essential to the physical health of the people; and adequate supply is equally required for the training and readiness of the Air Force, the production and transportation of goods essential to national defense, and the operations of the Navy, the merchant marine, and air and land transport in the event of military emergency. Even the dissent in the Steelworkers case considered a coal strike within the purpose of Congress in enacting 208, 361 U.S. 65, 80 S.Ct. 6; in today's economy the effect of a shortage of petroleum, the source of 45% of the energy consumed in this country as the record shows, would be at least as serious. The question, therefore, is whether the District Court was warranted in concluding that the maritime strike was threatening petroleum supply.
 
 
 4
 It plainly was. An affidavit of the Secretary of the Interior stated that the East Coast of the United States uses more than 3,500,000 barrels of oil daily;[5] that more than half this supply comes by tank vessel from United States Gulf Coast ports; and that legal requirements demand that this movement be in United States registered vessels. Other affidavits stated that more than half the American flag tankers active in the Gulf Coast-east Coast service were strikebound until the District Court issued its temporary restraining order; Judge Ryan was justified in accepting this estimate. The Secretary further averred there were no other means of transportation which could promptly replace the tankers; that, accordingly, spot shortages of petroleum products, especially gasoline, could be expected shortly; that these would rapidly worsen; that aircraft fuel would soon be in short supply; and that the necessary summer build-up of stocks of heating oils would be interfered with. Other Government officers attested the prospect of shortages of petroleum products affecting industrial operations necessary to the national defense. Defendants adduced no evidence requiring rejection of these statements.
 
 
 5
 We could rest here, and on the convincing evidence supporting the finding that continuation of the strike 'would have a critical impact upon Hawaii, which occupies a key position in our defense structure, because Hawaii's supply of essential foods (taking into account the time required for transportation from the West Coast to hawaii) would be exhausted * * *'[6] but for appellants' contention that, assuming so much to have been established, the injunction should have been limited to strikebound tankers serving the East Coast and ships in the Hawaii trade. True, this contention reminds of that with respect to 'a selective reopening of some of the steel mills * * * to fulfill specific defense needs,' which the Supreme Court rejected in the Steelworkers case, 361 U.S. 39, 43, see also 49-54, 80 S.Ct. 1, 4, 180-182. However, the economics of merchant shipping may not be parallel with those of steel as regards the feasibility of segregating particular operations; and we prefer to rest affirmance upon another finding to which this contention is inapplicable.
 
 
 6
 This finding is that 'Since the American merchant marine is intended, pursuant to the Merchant Marine Act, 1936 (46 U.S.C. 1101 et seq.), to be available as a naval and military auxiliary in time of war or national emergency, the strike, by rendering the merchant marine inoperative, would constitute a serious risk to the national health and safety'; we endorse this insofar as it refers to the national safety, which in view of the disjunctive wording of 208(a)(ii), is all that is required.
 
 
 7
 The Merchant Marine Act of 1936 was enacted, after comprehensive consideration, to replace predecessor statutes, Act of June 5, 1920, 41 Stat. 988; Act of May 22, 1928, 45 Stat. 689, themselves designed to prevent recurrence of the situation in World War I in which the United States had found itself almost without a merchant marine at a time when foreign nations, on whose ships we had become largely dependent, withdrew these for their own needs. The very first sentence of the Merchant Marine Act declares, 46 U.S.C.A. 1101, that 'It is necessary for the national defense * * * that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service on all routes essential for maintaining the flow of such domestic and foreign water-borne commerce at all times,' and '(b) capable of serving as a naval and military auxiliary in time of war or national emergency * * *' The Secretary of Commerce is directed 'to study, perfect, and adopt a long-range program for replacements and additions to the American merchant marine' in order to achieve various objectives, one of which is that 'the vessels in such fleet (are) to be so designed as to be readily and quickly convertible into transport and supply vessels in a time of national emergency,' 46 U.S.C.A. 1120. He is instructed also to maintain a Merchant Marine Academy, cadets appointed to which 'may be appointed by the Secretary of the Navy as Reserve midshipmen in the United States Navy and may be commissioned as Reserve ensigns in the United States Navy upon graduation from the Academy,' 46 U.S.C.A. 1126(b)(3). In the case of any application for a construction subsidy, the Federal Maritime Board must submit the plans and specifications to the Navy Department for suggestions as to changes 'necessary or proper in order that such vessel shall be suitable for economical and speedy conversion into a naval or military auxiliary, or otherwise suitable for the use of the United States Government in time of war or national emergency,' 46 U.S.C.A. 1151(b); 'any features incorporated in the vessel for national-defense uses' are to be paid for by the Board in addition to the construction-differential subsidy, 46 U.S.C.A. 1152(b). An operating-differential subsidy may be paid only on vessels 'which are to be used in an essential service in the foreign commerce of the United States,' 46 U.S.C.A. 1171(a); in determining what services are essential, the Secretary of Commerce is to consider 'the intangible benefit the maintenance of any such line may afford to the foreign commerce of the United States and to the national defense,' 46 U.S.C.A. 1121(a).
 
 
 8
 Even this bare summary of the statute would seem enough to show that when Congress in 1947 authorized an injunction against a strike imperilling the national safety, one thing it would have had in mind was a strike immobilizing nearly half of the United States merchant marine, which, in considerable part, had been created and was being continued at large public expense, and was designed by Congress to maintain the essential flow of commerce 'at all times' and to serve 'as a naval and military auxiliary in time of war or national emergency.' It is no answer that the maritime unions here have arranged for the movement of ships carrying military supplies now required by our existing forces abroad. What is vital is not merely the carriage of military supplies needed under current conditions but the instant availability of merchant ships-- both freight and passenger-- for the ballooning demands that war or national emergency would immediately produce. The need is for a merchant fleet in being-- not one largely laid up, in ports vulnerable to enemy attack, and with trained crews and shorebased personnel dispersed beyond the possibility of immediate recall.[7] One must have a short memory, indeed, to forget the emergency demands for merchant shipping in World War II both before[8] and after[9] Pearl Harbor, or, more recently, in the Korean crisis,[10] in the course of which President Truman made a declaration of national emergency, 64 Stat. A 454, 50 U.S.C.A.Appendix, preceding section 1 note, which is still in effect. Developments of the last decade have accentuated the need for mobility and speed; and no one can predict when that need will arise. It is significant that, in the month since the injunction here was issued, President Kennedy in his address of July 25, 1961, relating to the Berlin emergency, stressed 'expansion of our air and sea lift' so as to provide a capability 'of moving our forces quickly and in large numbers to any part of the world'; and that many ships and planes once headed for retirement are to be retained or reactivated.[11] It would be peculiarly improper for a court to reject the conclusion of the President that a strike which was immobilizing a substantial part of the country's civilian maritime transport at such a time imperilled the national safety, see 361 U.S. 48, 80 S.Ct. 179. It does not assist appellants that, as they urge, the program of developing a United States merchant marine may not have been so effective as was hoped; that is no reason for the Government's having to dispense with the fleet that has been created or to permit a long strike that might further impair it.
 
 
 9
 MEBA and MMP contend that, however the case may be in general, an injunction may not be issued against them because their members are supervisors, as defined in 2(11) of the National Labor Relations Act, as amended, 29 U.S.C.A. 152(11). Recognizing that their omission from the injunction would largely deprive it of practical effect, they nevertheless insist the plain words of the statute require this. Their argument is that what 208 of the Labor Management Relations Act of 1947 permits to be enjoined, by way of exception to the Norris-LaGuardia Act, 29 U.S.C.A. 101-115, is a 'strike or lock-out' of the sort described in that section and in 206; that 501(2) of the Labor Management Relations Act, 29 U.S.C.A. 142(2), preceded by the words 'when used in this Act * * *,' says that
 
 
 10
 '(2) The term 'strike' includes any strike or other concerted stop-page of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operation by employees';
 
 
 11
 that 501(3) says that 'employee' has 'the same meaning as when used in the National Labor Relations Act as amended by this Act'; and that 2(3) of the National Labor Relations Act, as so amended, 29 U.S.C.A. 152(3), says 'The term 'employee' * * * shall not include * * * any individual employed as a supervisor.' Hence, MEBA and MMP contend, a concerted cessation of work induced by unions representing only supervisors, as they claim to be, although a strike in ordinary speech, is not a 'strike' within 208.
 
 
 12
 We have had previous occasion to consider the status of MEBA and MMP under Federal labor legislation. In A. H. Bull Steamship Co. v. National Marine Engineers' Beneficial Ass'n, 2 Cir., 1967, 250 F.2d 332, these unions contended that because all the members there concerned were allegedly 'supervisors,' the unions were not 'labor organizations' subjected to suit in the Federal courts by 301 of the Labor Management Relations Act, 29 U.S.C.A. 185; although we indicated some belief that the contention might have merit, the point was not determined, our decision proceeding on the basis that in any event, as had just been held in A. H. Bull Steamship Co. v. Seafarers' International Union, 2 Cir., 1957, 250 F.2d 326, certiorari denied 1958, 355 U.S. 932, 78 S.Ct. 411, 2 L.Ed.2d 414, an anti-strike injunction was prohibited by 4 of the Norris-LaGuardia Act, 29 U.S.C.A. 104,-- 301 of the Taft-Hartley Act not containing an exclusion of Norris-LaGuardia similar to that in 208 and other sections of the Act, such as 10(h) and 302(e), 29 U.S.C.A. 160(h) and 186(e). In National Marine Engineers Beneficial Ass'n v. N.L.R.B., 2 Cir., 1960, 274 F.2d 167, though we accepted the proposition that a union comprised wholly of supervisors would not be a 'labor organization' within 8(b) of the National Labor Relations Act, 29 U.S.C.A. 158(b), we held that, on the facts there presented, the Board was justified in finding that non-supervisory employees participated in these two unions and hence in holding them within that section. Here the District Court made no finding whether appellants' factual claims were sustained. Assuming, for the purposes of this case only, that the facts are as the unions claim, we feject their contention as to the law.
 
 
 13
 Even if our approach to interpretation of the statute had to be as literal as appellants urge, the result for which they contend would not be a necessary one. Section 501(2) does not say that the term 'strike' is limited to what is there described; it says the term 'includes' the things there mentioned. In this respect it contrasts with 501(1) and (3), both of which use the word 'mean.' Hence it is decidedly arguable that, even on appellants' tack, 'strike' as used in 206 and 208 means anything that would be called a strike in ordinary speech plus anything else mentioned in 501(2).
 
 
 14
 However, not only are we not required, we are not permitted to interpret statutes in the mechanical fashion for which appellants contend. In Church of the Holy Trinity v. United States, 1892, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226, the Supreme Court, hurdling the line of British decisions stemming from Millar v. Taylor, 4 Burr. 2303, 2332 (1769), endorsed and applied the earlier interpretive method of the common law whereby, as said in Stradling v. Morgan, 1 Plowden 199, 205 (1559), court look not merely to the letter but to 'the intent of the legislature, which they have collected sometimes by considering the cause and necessity of making the Act, sometimes by comparing one part of the Act with another, and sometimes by foreign circumstances.' Thirty years later the Court again taught that if giving the words of the statute their natural significance 'leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, dacrificing, if necessary, the literal meaning in order that and purpose, sacrificing, if necessary, United States, 1922, 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199. Many subsequent decisions, of which United States v. American Trucking Assns., 1940, 310 U.S. 534, 543-544, 60 S.Ct. 1059, 84 L.Ed. 1345: S.E.C. v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 350-351, 64 S.Ct. 120, 88 L.Ed. 88; Harrison v. Northern Trust Co., 1943, 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407; and Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1955, 348 U.S. 437, 444, 75 S.Ct. 489, 99 L.Ed. 510, are examples, have reiterated the lesson.
 
 
 15
 History negates the claim that the special status which the Taft-Hartley Act of 1947 gave to supervisors under the National Labor Relations Act by the definitions in 2(3), (5) and (11), 29 U.S.C.A. 152, and by 14, 29 U.S.C.A. 164, was meant to be carried over into the national emergency injunction provisions of 206 and 208. The Act, as is well known, has several titles. Title I contained amendments, many of them highly controversial to the National Labor Relations Act; the others constituted new legislation. Serious problems as to the status of supervisors has arisen under the National Labor Relations Act. The 1947 amendment of the definition of 'employee' to exclude supervisors and the mandate of 14, that no employer 'shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining,' were, as we said in National Marine Engineers Beneficial Ass'n v. N.L.R.B., supra, 274 F.2d at page 173, 'designed to change the result reached in Packard Motor Car Co. v. N.L.R.B., 1947, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040, under the original Act.'[12] The legislative history is replete with references showing that both those who proposed the change as to supervisors and those who opposed it understood it to relate to the provisions of Title I, the original National Labor and related matters. 80th Cong.1st and related matters. 80th Cong.1st Sess., H.R.Rep. No. 245 on H.R. 3020, pp. 5, 13-17; Sen.Rep. No. 105 on S. 1126, pp. 3-5, 28; House Conference Report No. 510 on H.R. 3020, p. 60; 93 Cong.Rec. 3533 (Representative Hartley), 3322 (Senator Wagner-- opposing), 3952 (Senator Taft); 4260 (Senator Ellender), 4490 (Senator Pepper-- opposing), 4566 (Senator Johnson-- opposing), 5105 (Senator Murray-- opposing and proposing a substitute bill), 5146 (Senator Ball). Not one of these statements-- or any other that has been called to our attention or that we have found-- conveys any thought that supervisory employees were to be excluded from any provisions outside Title I, the National Labor Relations Act as amended. The effect was, as Senator Taft stated, that supervisors 'do not have the protection of the National Labor Relations Act. * * * they are generally restored to the basis which they enjoyed before the passage of the Wagner Act.' 93 Cong.Rec. 3952. Nothing in this suggests that supervisors' unions were intended to be immune from other parts of the Taft-Hartley Act relating to unions generally.
 
 
 16
 Sections 206-208, relating to injunctions against strikes creating national emergencies, had an altogether different origin. Section 6 of the War Labor Disputes Act, 57 Stat. 163, 165 (1943), often called the Smith-Connally Act, had enabled the Government to deal with work stoppages threatening the effective prosecution of the war, by making it unlawful to conspire in or induce a strike or other interruption of work in 'any plant, mine, or facility * * * in the possession of the United States.' Injunctive relief under the Smith-Connally Act had been needed to prevent a coal strike, and the Supreme Court had sustained the propriety of that injunction while the Taft-Hartley Act was in process, United States v. United Mine Workers of America, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884. However, the War Labor Disputes Act was to expire on June 30, 1947. In his State of the Union message of January 6, 1947, President Truman called to the attention of Congress the pressing need to create 'an adequate system and effective machinery' to replace what had been done 'by the use of extraordinary war powers' to deal with 'the special and unique problem of Nation-wide strikes in vital industries affecting the public interest.' U.S.Code Congressional Service, 80th Cong. 1st Sess.1947, pp. 1722-1723.
 
 
 17
 What ultimately became sections 206-208 of the Taft-Hartley Act was a response to this. These sections could as well have been the subject of a separate bill-- indeed, initially they were, 80th Cong. 1st Sess., H.R. 2861, a stop-gap measure reported in H.R.Rep.No. 235. Under the text of the Hartley bill, H.R. 3020, as reported to and passed by the House, no basis for the argument now made by MEBA and MMP would have existed. Section 203(a) of that bill provided that 'Whenever the President finds that a labor dispute has resulted in, or imminently threatens to result in, the cessation or substantial curtailment of interstate or foreign commerce in transportation, public utility, or communication services essental to the public health, safety, or interest,' a district court, on a petition of the Attorney General filed on the direction of the President, should have jurisdiction 'to enjoin acts or practices in connection with such dispute'; the word 'strike' was not used. The Senate substituted its own bill. As passed by the Senate the corresponding provision was broader than that in the House bill in that it included other industries engaged in commerce or the production of goods for commerce, narrower in being limited to 'substantially an entire industry' and perhaps, as appellants urge but we do not decide, in requiring a showing of peril to the national health or safety, omitting 'interest.' Along with these substantive changes the language was altered to say that what was to be enjoined was 'a threatened or actual strike or lock-out,' rather than 'acts or practices' in connection with a labor dispute resulting in cessation or substantial curtailment of activity. The lack of significance in this textual change is confirmed by the Senate's retention in 209(a) of language coming from 204(a) of the House bill: 'Whenever a district court has issued an order under section 208 enjoining acts or practices which imperil or threaten to imperil the national health or safety * * *' The House likewise showed no awareness of any essential difference between the bills in this respect; in reviewing the variances, the House managers in the conference, where the final text was evolved, spoke of the House bill as having given 'the President, through the district courts of the United States, power to deal with strikes' etc. To say, in the light of this history, that the Senate's substitution of the words 'a threatened or actual strike or lockout' for the House's 'acts or practices,' and the simultaneous insertion of the provisions of 501(2) regarding a 'strike' had the effect of exempting strikes called by unions representing supervisors from the generality of the national emergency provisions, deemed vital not only by those approving but by many opposing other sections of the bills, would produce 'an unreasonable result plainly at variance with the policy of the legislation as a whole.' We find nothing in United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335, relied on by MEBA and MMP, that requires us to reach it. On the contrary, the Court indicated that the direction, in 501(3), 29 U.S.C.A. 142(3), that the term 'representative' as used 'in this Act' was to 'have 'the same meaning as when used in the National Labor Relations Act as amended by this Act," was not to be given a 'severely restricted construction' if that would 'frustrate the primary intent of Congress,' 350 U.S. at pages 305-307, 76 S.Ct. at pages 404-405.
 
 
 18
 SIU objects to the injunction against it on the ground that, by the time the injunction was issued, SIU had settled its differences with all save two employers operating 18 vessels.[13] Quite likely, if that were the only strike, it would not be against a 'substantial part' of the industry, at least in the absence of circumstances such as those in United States v. United Steelworkers of America, 2 Cir., 1953, 202 F.2d 132. However, that is not the instant case. If the strike was enjoinable, as we hold it to have been, the injunction may reach all who participated in it, whether their effect was large or small.
 
 
 19
 Affirmed.
 
 
 
 [1]
 That evening Judge Clark declined to stay the temporary restraining order; he later issued a short opinion. 2 Cir., 292 F.2d 190
 
 
 [2]
 This figure takes account of settlements negotiated between the appointment of the Presidential board of inquiry and the grant of the injunction
 
 
 [3]
 We assume, as the District Court and the parties have done, that, in applying 208(a)(i) to this case, 'an entire industry or a substantial part thereof' refers to the United States merchant marine, although the availability of foreignflag shipping must be considered in determining whether a strike of part of the United States flag fleet 'will imperil the national health or safety' within 208(a)(ii). We express no opinion on the applicability of 208 to vessels not under the United States flag
 
 
 [4]
 We have not passed upon findings of the District Court as to the strike's effect on the national health or safety other than the three specifically discussed below
 
 
 [5]
 We have limited our discussion to the East Coast in view of the unions' showing that there was no interruption of tanker shipments on the West Coast
 
 
 [6]
 Sea transportation between the continental United States and Hawaii, like that between the Gulf Coast and the East Coast, must, of course, be in United States registered vessels, 46 U.S.C.A. 883
 
 
 [7]
 See Gorter, United States Shipping Policy (1956), p. 75
 
 
 [8]
 Even at the low tempo at which World War II began, the British Navy, Air Force and Army had an immediate requirement of 3,000,000 tons to be drawn from the merchant fleet, including naval auxiliaries 'which must be drawn chiefly from the highest class of liners,' Churchill, The Twilight War, pp. 414-415. In 1939 the United States took over 2,000,000 tons of its own merchant shipping to assist British troop movements to Africa and the Near East, American Merchant Marine Institute, Inc., The American Merchant Marine in the War (1943), p. 19; later it chartered President liners to remove Marines from China and took over the SS. America to transport Canadian troops, 3 Morison, History of United States Naval Operations in World War II (1948), p. 155; Riesenberg, Sea War-- The Story of the United States Merchant Marine in World War II (1956), p. 30. See also Palmer, We Fight with Merchant Ships (1943), pp. 160-162
 
 
 [9]
 See Nevins, Sail On-- The Story of the American Merchant Marine (1946), p. 92; American Merchant Marine Institute, Inc., supra note 8, p. 8. The SS. Lurline, at sea between California and Hawaii, was called back to San Francisco to serve as a troop transport, Riesenberg, supra note 8, p. 35
 
 
 [10]
 See Wolfe, Yankee Ships-- An Informal History of the American Merchant Marine (1953), pp. 266-268
 
 
 [11]
 N.Y. Times, July 26, 1961, p. 10, cols. 2, 3. We take note also of reported plans to reactivate ships in the 'moth-balled' fleet and to recall reserve transport units; N. Y. Times, July 22, 1961, p. 6, col. 4; July 28, 1961, p. 3, cols. 2-4; July 30, 1961, p. 39, col. 1; August 18, 1961, p. 1, col. 6, p. 2, cols. 1-3
 
 
 [12]
 The House Report on the Hartley bill, H.R.Rep. No. 245, p. 14, explained that a provision eliminating supervisors from the National Labor Relations Act and thereby overruling the Board's ruling in the Packard case, 61 N.L.R.B. 4 (1945), later affirmed by the Supreme Court, had been included in the so-called Case bill, H.R. 4908, 79th Cong., 2d Sess., which had failed of enactment because of Presidential veto. The bill passed by the 79th Congress likewise had a provision, 6, for the appointment of emergency commissions to deal with strikes in public utilities; nothing in its language would have supported a claim that unions representing supervisors were exempt from it
 
 
 [13]
 We were told on oral argument that since the injunction SIU had settled with one employer having four ships