**DISTRICT 2 MARINE ENGINEERS BENEFICIAL ASSOCIATION-ASSOCIATED MARITIME OFFICERS, AFL-CIO, Plaintiff-Appellant,**

v.

**GRAND BASSA TANKERS, INC., Defendant-Appellee.**

**No. 867, Docket 80–9016.**

United States Court of Appeals, Second Circuit.

Argued April 1, 1981.

Decided Oct. 29, 1981.

Joel C. Glanstein, New York City (Lawrence C. Chapin, O'Donnell & Schwartz, New York City, of counsel), for plaintiff-appellant.

Marvin E. Frankel, New York City (Mark A. Wainger, Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for defendant-appellee.

Before MANSFIELD and VAN GRAAFEILAND, Circuit Judges, and B. NEWMAN,* Judge.

MANSFIELD, Circuit Judge:

District 2 Marine Engineers Beneficial Association-Associated Maritime Officers, AFL-CIO ("MEBA"), appeals from a judgment of the Eastern District of New York entered by Judge Jacob Mishler denying MEBA's motion for a preliminary injunction and dismissing for lack of jurisdiction its complaint against Grand Bassa Tankers, Inc. ("Grand Bassa"), formerly known as International Oil Transport Corporation ("IOTC"), owner of an oil tanker fleet. Invoking jurisdiction under § 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a) ("the Act"), MEBA claimed

* Of the U.S. Court of International Trade, sitting by designation.

that Grand Bassa refused to perform a contract entered into between them on January 5, 1979, obligating Grand Bassa to contract for operation of its vessels by an operator-employer having labor agreements with MEBA and sought specific performance of the contract. We affirm on the ground that federal jurisdiction under § 301(a) is lacking.

Although Grand Bassa and its predecessor IOTC have been owners of vessels, they have not at any relevant times employed the crews manning the ships or entered into collective bargaining agreements with unions representing the crews. Instead the management and operation of the vessels were in 1976 turned over to Interocean Management Corporation ("IOM"), an independent company operating vessels for various shipowners (including Standard Oil of Ohio, Shell Oil and the First National Bank of Boston), pursuant to a contract making IOM wholly responsible for the operation, management and conduct of the business of the ships, including the employment of their crews and labor policies. IOM as employer had entered into a labor agreement with MEBA providing that deck and engineer officers who were members of MEBA would man IOM-managed ships. Upon IOM's becoming the operator of ships owned by Grand Bassa, then known as IOTC, the agreement became applicable to IOM and MEBA with respect to those ships. Under this agreement the sole employer of the officers on these ships was IOM. When the IOM-MEBA agreement expired in June, 1978, they negotiated a new collective bargaining agreement, to which they alone were parties. Neither Grand Bassa nor its predecessor IOTC ever participated in negotiations leading up to any IOM-MEBA collective bargaining agreements nor were they parties to those agreements.

In December, 1978, Grand Bassa, then named IOTC,[1] sold one of its tankers, the S.S. Fort Hoskins, which had previously been operated by IOM, to a company that did not use an operator employing MEBA members. MEBA thereupon asserted a severance pay claim against IOM, relying on the collective bargaining agreement which it had with IOM. In order to accelerate resolution of the dispute, IOTC (Grand Bassa) entered into direct communication with MEBA. On January 5, 1979, IOTC and MEBA entered into an agreement settling the dispute, under which, in return for a $20,000 contribution by IOTC (Grand Bassa) to the MEBA benefit plan, MEBA agreed to abandon its claim against IOM growing out of the sale of the Hoskins. The agreement also provided that "any Operator employed by [IOTC (Grand Bassa)] to operate its U.S.-flag ships shall have Labor Agreements with [MEBA] until June 15, 1981."[2]

On August 8, 1980, Grand Bassa notified IOM that it intended to terminate its management operation contract with IOM on August 15, 1980, and that it was retaining Trinidad Corporation as manager and operator in IOM's place. Trinidad does not have a collective bargaining agreement with MEBA. Instead, its collective bargaining agreement with respect to officers on ships managed by it is with another union, which under the fleet-wide accretion principle represents all deck and engineer officers aboard Trinidad ships, just as MEBA represents all such officers employed by IOM. MEBA then brought the present action for specific performance of its January 5, 1979, agreement with Grand Bassa obligating the latter to contract with an operator for its ships which would have a labor agreement with MEBA. MEBA sought to enjoin IOTC (Grand Bassa) from transferring operation of its tankers from IOM to Trinidad.

Federal jurisdiction was invoked by MEBA under § 301(a) of the Act, which confers such jurisdiction over "[s]uits for

1. IOTC changed its name to Grand Bassa on June 1, 1979, and notified MEBA of the change.

2. Later IOTC (Grand Bassa) sold two more vessels, the Bradford Island and Cities Service Norfolk, leading to additional MEBA severance claims, one of which was settled and the other arbitrated between IOM and MEBA pursuant to their collective bargaining agreement, to which Grand Bassa was not a party.

violation of contracts between an employer and a labor organization representing employees."[3] Grand Bassa moved to dismiss the complaint on the ground, among others, that subject matter jurisdiction was lacking because there was no employer-employee relationship between itself and MEBA or its members, the sole such relationship being between IOM and MEBA. MEBA argued in reply that (1) since Grand Bassa had employees of its own who were admittedly not members of MEBA, it should be deemed an "employer" as that term is used in § 301(a), bringing the January 5, 1979, Grand Bassa-MEBA contract within the Act, and (2) Grand Bassa, because of its relationship with IOM, should be considered an employer of MEBA members. Judge Mishler after an evidentiary hearing held that, although the Supreme Court in *Retail Clerks International Assoc. v. Lion Dry Goods, Inc.*, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962), had stated that the term "contracts" in § 301(a) was not limited to collective bargaining agreements, § 301(a) applied only to contracts between parties linked by an employer-employee relationship. Jurisdiction under § 301(a) therefore did not exist because Grand Bassa was not an employer of MEBA members and the January 5, 1979, agreement did not relate to Grand Bassa's employees. IOM was the sole signatory to the MEBA collective bargaining agreement and the management agreement between Grand Bassa and IOM left the elements of the employer-employee relationship (e.g., wages, hours, promotions) entirely to IOM's exclusive discretion as employer. Accordingly the district court dismissed the action for lack of federal jurisdiction and denied injunctive relief, from which MEBA appeals.

## DISCUSSION

Section 301(a) confers federal jurisdiction over suits "for violation of contracts between an employer and a labor organization representing employees." Read literally, as MEBA asks us to do, this language would embrace contracts between an employer and a labor organization even though the employer, like Grand Bassa, does not employ any person represented by the labor organization, in this case MEBA. In construing the language of a statute, however, we must look beyond its literal language to its purpose. As Learned Hand warned "it is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning," *Peter Pan Fabrics Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960). Equally appropriate for present purposes are his remarks in *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944) (concurring opinion), where he stated:

"It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins. . . . There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final."

See also *Federal Deposit Ins. Corp. v. Tremaine*, 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, C.J.) ("There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it.")

 As the legislative history of § 301(a) and Supreme Court decisions interpreting it

---

**3.** Section 301(a) also confers federal jurisdiction upon suits "between any such labor organizations" (i.e., those "representing employees in an industry affecting commerce as defined in this Act.") Since the present suit is not between labor organizations this provision has no relevance, and MEBA's citation of decisions under it is not instructive.

make clear, Congress' aim in enacting it was to promote industrial peace through the collective bargaining process by assuring the enforceability by federal courts of collective bargaining agreements between employers and labor unions. *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Dowd Box Co. v. Courtney,* 368 U.S. 502, 509, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962); *Retail Clerks v. Lion Dry Goods,* 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962); *Complete Auto Transit, Inc. v. Reis,* —— U.S. ——, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981).[4] As the Supreme

4. The long legislative history of § 301(a) and various versions found in the bills before Congress that ripened into the Labor Management Relations Act of 1947 demonstrate that Congress' purpose was to render collective bargaining agreements enforceable against labor unions in the federal courts. For example, Senate Report No. 105 on S. 1126, which contained an earlier version of § 301(a), stated:

> "ENFORCEMENT OF CONTRACT RESPONSIBILITIES
>
> "The committee bill makes collective-bargaining contracts equally binding and enforceable on both parties. In the judgment of the committee, breaches of collective agreements have become so numerous that it is not sufficient to allow the parties to invoke the processes of the National Labor Relations Board when such breaches occur (as the bill proposes to do in title I). We feel that the aggrieved party should also have a right of action in the Federal courts. Such a policy is completely in accord with the purpose of the Wagner Act which the Supreme Court declared was 'to compel employers to bargain collectively with their employees to the end that an employment contract, binding on both parties, should be made' (*H. J. Heinz & Co.,* 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309).
>
> "The laws of many States make it difficult to sue effectively and to recover a judgment against an unincorporated labor union. It is difficult to reach the funds of a union to satisfy a judgment against it. In some States it is necessary to serve all the members before an action can be maintained against the union. This is an almost impossible process. Despite these practical difficulties in the collection of a judgment against a union, the National Labor Relations Board has held it an unfair labor practice for an employer to insist that a union incorporate or post a bond to establish some sort of legal responsibility under a collective agreement.
>
> "President Truman, in opening the management-labor conference in November 1945, took cognizance of this condition. He said very plainly that collective agreements should be mutually binding on both parties to the contract:
>
> " 'We shall have to find methods not only of peaceful negotiations of labor contracts, but also of insuring industrial peace for the lifetime of such contracts. Contracts once made must be lived up to and should be changed only in the manner agreed upon by the parties. If we expect confidence in agreements made, there must be responsibility and integrity on both sides in carrying them out.'
>
> "If unions can break agreements with relative impunity, then such agreements do not tend to stabilize industrial relations. The execution of an agreement does not by itself promote industrial peace. The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract.
>
> "Consequently, to encourage the making of agreements and to promote industrial peace through faithful performance by the parties, collective agreements affecting interstate commerce should be enforceable in the Federal courts. Our amendment would provide for suits by unions as legal entities and against unions as legal entities in the Federal courts in disputes affecting commerce.
>
> \* \* \*
>
> "TITLE III
> "SUITS BY AND AGAINST LABOR ORGANIZATIONS
>
> "Section 301 is the only section contained in this title. It relates to suits by and against labor organizations for breach of collective bargaining agreements and should be read in connection with the provisions of section 8 of title I also dealing with breach of contracts. The legal effect of this section has been described at some length in the main body of the report, supra." S.Rep.No.105, 80th Cong., 1st Sess. 15–16, 30 (1947) (report on S.1126).

House Minority Report No. 245 on H.R. 3020, the companion bill to S.1126, states:

> "2.—Suits by and Against Unions in the Federal Courts
>
> "Section 302 [301 of S.1126] of title II has the dual purpose first of giving the Federal courts jurisdiction, without regard to the amount in controversy, to entertain actions involving violations of collective bargaining agreements affecting commerce or where the court otherwise has jurisdiction of the cause; and, second, of providing for suit against labor organizations whose activities affect commerce, with judgment enforceable only against the union assets. In any such suits

Court observed in *Dowd*, 368 U.S. at 509, 513, 82 S.Ct. at 525–26:

"The Labor Management Relations Act of 1947 represented a far-reaching and many-faceted legislative effort to promote the achievement of industrial peace through encouragement and refinement of the collective bargaining process. It was recognized from the outset that such an effort would be purposeless unless both parties to a collective bargaining agreement could have reasonable assurance that the contract they had negotiated would be honored. Section 301(a) reflects congressional recognition of the vital importance of assuring the enforceability of such agreements.

\* \* \* \* \* \*

"This basic purpose of § 301 is epitomized in the Senate Report: 'It is apparent that until all jurisdictions, and particularly the Federal Government, authorize actions against labor unions as legal entities, there will not be the mutual responsibility necessary to vitalize collective-bargaining agreements.' S.Rep.No.105, 80th Cong., 1st Sess., p. 17."

Federal jurisdiction was granted because of the need for a uniform federal law fashioned from a national labor policy, see *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957), and because many state courts could not

provide adequate relief because of local rules or decisions inhibiting suits by or against labor organizations as entities, leading to "checkerboard jurisdiction." *Seymour v. Schneckloth*, 368 U.S. 351, 358, 82 S.Ct. 424, 428, 7 L.Ed.2d 346 (1962).[5]

■ The overwhelming majority of suits between employers and unions under § 301(a), as might be expected, seek enforcement of collective bargaining agreements between them which relate to the employer's employees. On the other hand, as the Supreme Court held in *Retail Clerks v. Lion Dry Goods, supra,* the term "contracts" as used in § 301(a) is not limited to traditional collective bargaining agreements and the section does not require that the labor organization be the exclusive bargaining representative of the employer's employees. It may be the former bargaining representative seeking to enforce an agreement dealing directly with the working conditions and employment relationship of the employer's existing or prospective employees. In *Retail Clerks*, for instance, a labor organization which had represented the employer's employees until its collective bargaining agreement on their behalf expired was permitted to sue the employer under § 301(a) for breach of an agreement terminating a strike by those employees which had followed expiration of the collec-

the union would be bound by the acts of its agents and the courts would have the power to grant injunctive relief regardless of the provisions of the Norris-LaGuardia Act." H.R.Rep.No.245, 80th Cong., 1st Sess. 108 (1947) (minority report on H.R.3020).
Reporting on the Senate floor, Senator Taft, principal author of the Act, stated:
"What is the purpose of title III? The purpose of title III is to give the employer and the employee the right to go to the Federal courts to bring a suit to enforce the terms of a collective-bargaining agreement—exactly the same subject matter which is contained in titles I and II. It is impossible to separate them. The committee had difficulty even in separating matters as between titles, and moved some matters back and forth from one title to another." 94 Cong.Rec. 4265 (1947).
"Finally, we have a provision in title III for bringing a lawsuit for breach of contract. Breach of what kind of contract? Breach of

contract for collective bargaining." 93 Cong. Rec. 4390 (1947).
Senator H. Alexander Smith, supporting the bill, stated:
"I now come to title III, which is very brief, and merely provides for suits by and against labor organizations, and requires that labor organizations, as well as employers, shall be responsible for carrying out contracts legally entered into as the result of collective bargaining. That is all title III does. I cannot conceive of any sound reason why a party to a contract should not be responsible for the fulfillment of the contract; it is outside my comprehension how anyone can take such a position." 93 Cong.Rec. 4410 (1947).

5. Federal jurisdiction was not to be exclusive. The parties remained entitled to enforce labor agreements in the state courts. *Charles Dowd Box Co. Inc. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

tive bargaining agreement. The strike settlement agreement, although not a traditional "collective bargaining contract," dealt with the working conditions of the employees of the defendant employers, including reinstatement of strikers and continuation of detailed wage and hour schedules, pending arbitration.

"It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. It came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the working conditions of the employees of both respondents. It effected the end of picketing and resort by the labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship." 369 U.S. at 28, 82 S.Ct. at 548.

For present purposes the important point is that the agreement, although not a traditional collective bargaining contract, was a labor contract governing certain terms and conditions of the employer's relations with its employees. Following *Retail Clerks*, agreements of the same type between labor organizations and employers relating to the latter's employees have been enforced by federal courts, exercising their jurisdiction under § 301(a). See, e.g., *A. Seltzer & Co. v. Livingston*, 253 F.Supp. 509 (S.D.N.Y.), aff'd per curiam, 361 F.2d 218 (2d Cir. 1966); *Deaton Truck Line, Inc., v. Local Union 612*, 314 F.2d 418 (5th Cir. 1962).

Of the hundreds of actions invoking federal jurisdiction under the employer-labor organization contract clause of § 301(a) we have not found any case which did not involve an agreement relating to the employer's relationship with its own employees. Nor do we view *Thomas v. Old Forge Coal Co. and Jennie Minichello*, 329 F.Supp. 1000 (M.D.Pa.1971), as standing for a differ-

ent proposition. There, the Old Forge Coal Company agreed in a collective bargaining contract with the United Mine Workers to pay royalties to a trust fund for the benefit of the company's employees. The trustees, invoking § 301(a) jurisdiction, sued both the company and its sole stockholder, Ms. Minichello, who signed the agreement as guarantor, for breach of the contract. The court, relying upon *Retail Clerks*, refused to dismiss the action against Ms. Minichello, holding that the contract arose out of "the employment relationship" since she, as the sole stockholder and guarantor, amounted to an "employer" within the meaning of § 301(a), and that in any event exercise of pendent jurisdiction over the claim against her was appropriate. Since Ms. Minichello was the sole stockholder of the Old Forge Coal Company as well as a co-signer and guarantor of the contract, which dealt with the terms of employment of its employees, the case cannot reasonably be viewed as holding that a third party entering into a contract which does not involve its employees will be considered an "employer" within the meaning of § 301(a).

The reasonable conclusion to be drawn from the legislative history of § 301(a) and numerous decisions interpreting its employer-labor organization contract clause is that the term "employer" therein refers to the person or entity employing persons who are the subject of the contract with the labor organization and that Congress did not intend to create federal jurisdiction over all contracts between labor organizations and others merely because they happened to be employers. Such an interpretation, carried to its logical extreme, would entitle one party to sue the other for breach or enforcement of a contract for the sale of an automobile, as long as one was an employer and the other a labor organization. Surely Congress did not intend to create such all-inclusive federal jurisdiction when it enacted § 301(a).[6]

---

**6.** Our conclusion is not altered by the fact that the Act contains a cross reference to a definition of "employee" contained in the National Labor Relations Act ("NLRA"), which MEBA

claims (belatedly in its reply brief) supports its position. Section 501(3) of the Act, 29 U.S.C. § 142(3), provides that the term "employee" shall have the same meaning as when used in

■ The January 5, 1979, contract between Grand Bassa and MEBA does not meet these jurisdictional pre-requisites of § 301(a) as it has thus been interpreted. The contract is not with a labor organization representing any of Grand Bassa's employees. Nor does it relate to the terms or conditions of their employment, much less to the relationship between Grand Bassa and its employees. It relates to a different matter, the type of companies with which Grand Bassa might in the future contract to become operators of its fleet. As far as the contract was concerned Grand Bassa could have had no employees at all. MEBA's contention that § 301(a) jurisdiction may be invoked on the ground that it is a labor organization and Grand Bassa happens to have some employees must therefore be rejected.

■ Nor are we persuaded by MEBA's argument that § 301(a) jurisdiction may be invoked on the ground that its contract here, even though it does not involve any of Grand Bassa's employees or any labor dispute affecting them, may nevertheless be treated as if IOM's employees, who were represented by MEBA, were employees of Grand Bassa, since the effect of the contract was to promote "labor peace" with respect to officers employed by IOM on ships owned by Grand Bassa. The contention simply ignores the fact that Grand Bassa has nothing to do with the employ-

the NLRA. The NLRA (formerly the Wagner Act, incorporated in the LMRA as Title I, 29 U.S.C. §§ 151–169) provides in § 2(3), 29 U.S.C. § 152(3), that "[t]he term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, . . . ."

MEBA argues that, in light of the NLRA's definition of employee as incorporated into the Act by § 501(3), federal jurisdiction under § 301(a) exists even where the contract sought to be enforced does not relate to employees of the defendant-employer. MEBA's reliance on § 2(3) is misplaced. As the Supreme Court recently made clear in *Eastex, Inc. v. NLRB*, 437 U.S. 556, 564, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978), "[t]his definition was intended to protect employees when they engage in otherwise proper concerted activities in support of employees of employers other than their own." See also 437 U.S. at 564 n. 12, 98 S.Ct. at 2512 n. 12 (legislative history cited therein). The particular definition of "employee" in § 2(3), thus has nothing to do with § 301(a) federal jurisdiction. Moreover, the legislative history of the Act reveals that, in amending the definition of employee under § 2(3), Congress was primarily concerned to make clear that an employee who had ceased work as a consequence of a current labor dispute, and was therefore not an employee of any particular employer at that time, nevertheless retained his employee status for purposes of the NLRA. H.R. Rep. No. 245, 80th Cong., 1st Sess. 12, 68 (1947); H.R. Rep. No. 510, 80th Cong., 1st Sess. 32–33 (1947), U.S. Code Cong. Serv. 1947, 1135. 93 Cong. Rec. 1893 (1947). The definitions were thus an attempt to clarify the jurisdiction of the National Labor Relations Board by delimiting the reach of the compulsory features of the NLRA relating to collective bargaining and other matters. This is evidenced by the explicit exclusion of certain classes of employees in § 2(3)—supervisory personnel, agricultural workers, independent contractors—from the protection of the NLRA. See S. Rep. No. 105, 80th Cong., 1st Sess. 19 (1947) (discussing reason for excluding supervisory personnel from NLRA coverage); H.R. Rep. No. 245, 80th Cong., 1st Sess. 5, 14 (1947) (same). There is no evidence that Congress intended the definitions contained in § 2(3) to be the criteria for the existence of federal jurisdiction under § 301(a). Such an intention would have been odd, since § 2(3) was part of Title I, aimed at amending the old Wagner Act, while § 301(a) was part of the "new legislation" contained in Titles II through V. *United States v. National Marine Engineers' Beneficial Association*, 294 F.2d 385, 391 (2d Cir. 1961). Although Title V, § 501(3) does cross-reference to Title I and the definitions contained therein, this appears to have been done as a matter of "drafting economy." *Dist. 2, Marine Engineers Beneficial Association v. Amoco Oil Co.*, 554 F.2d 774, 776 (6th Cir. 1977).

Accordingly, courts have consistently rejected the wooden application of the words of § 2(3) to determine the existence of federal jurisdiction under § 301(a). See, e.g., *Dist. 2, Marine Engineers Beneficial Association v. Amoco Oil Co.*, 554 F.2d at 778; *Crilly v. Southeastern Pa. Transportation Authority*, 529 F.2d 1355, 1358–60 (3d Cir. 1976); *Dente v. International Organization of Masters, Mates and Pilots*, 492 F.2d 10, 12 (9th Cir. 1973), cert. denied, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974); *United States v. National Marine Engineers' Beneficial Association*, 294 F.2d 385, 390–92 (2d Cir. 1961); *Isbrandtsen Co. v. Dist. 2, Marine Engineers Beneficial Association*, 256 F.Supp. 68 (E.D.N.Ẏ.1966). See also *United States v. Ryan*, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956).

ment of officers aboard its ships. They are hired solely by IOM, without any control, participation, signature, or any other type of obligation on the part of Grand Bassa. Their sole "employer" is IOM.

The concept that, absent an employer-employee relationship between the parties, § 301(a) should nevertheless be interpreted to embrace a suit to enforce any contract aimed at promoting "labor peace," even between third parties (in this case IOM and MEBA), would substitute a loose, possibly unworkable standard for what Congress intended. It would thrust upon a federal court in each such case the difficult task of attempting at the outset to determine through a minitrial on the merits whether the specific contract involved would promote labor peace or stability, a fuzzy issue at best, before the court could assume jurisdiction. In our view the sounder course lies in the adoption of a more definite test, that of requiring employer-employee privity, which is consistent with the statute's language, is in accord with Congress' intent, and avoids the confusion that would exist under a loose or indefinite criterion. See, in accord, *Service, Hospital, Nursing Home & Public Employees Union v. Cleveland Tower Hotel, Inc.*, 606 F.2d 684 (6th Cir. 1979). Indeed, with the exception of *Thomas v. Old Forge Coal Co.*, which we have shown to be clearly distinguishable, the decisions relied upon by MEBA involve contracts relating to employees of the contracting employer[7] or actions under § 301(a)'s express provision for jurisdiction over suits "between any such labor organizations," which have no relevance here.[8]

We have reached this conclusion only after careful consideration of the decisions cited by our distinguished colleague Judge Van Graafeiland, some of which uphold the jurisdiction of federal courts to adjudicate the legality of "hot cargo" agreements, regardless of the existence of an employer-employee relationship between the parties. See *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB*, 609 F.2d 1341 (9th Cir. 1979). In our view none of these cases are pertinent to the issue before us, which is the scope of the jurisdiction of federal courts under § 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a). The decisions relied on by Judge Van Graafeiland did not involve suits under § 301(a) of the Act or the jurisdiction created by that section. *Connell*, for instance, was a suit by a construction company against a labor union (Local 100) under the Sherman Act and state antitrust laws, arising out of the union's efforts to force construction contractors to subcontract all work to companies employing members of the union. One of the union's principal defenses was that § 8(e) of the National Labor Relations Act, which exempts certain union-management agreements in the construction industry from "hot cargo" laws, provided a defense against charges of violating the Sherman Act. The critical language of § 8(e) confers this protection on

> "an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work."

---

7. *A. Seltzer & Co. v. Livingston*, 253 F.Supp. 509 (S.D.N.Y.), *aff'd per curiam*, 361 F.2d 218 (2d Cir. 1966); *District 2, Marine Engineers Beneficial Association v. Amoco Oil Co.*, 554 F.2d 774 (6th Cir. 1977); *Deaton Truck Line, Inc. v. Local Union 612, International Brotherhood of Teamsters*, 314 F.2d 418 (5th Cir. 1962); *Local Union No. 115, United Association of Journeymen and Apprentices, Etc. v. Townsend & Bottom, Inc.*, 383 F.Supp. 1339 (3d Cir. 1975); *Truck Drivers & Helpers v. Grosshans & Petersen, Inc.*, 209 F.Supp. 164 (D.Kan.

1962); *Laborers' International Union of North America, Local 107 v. Kunco, Inc.*, 344 F.Supp. 626 (W.D.Ark.1972).

8. *Drywall Tapers and Pointers of Greater N.Y., Local 1974, et al. v. Operative Plasterers' and Cement Masons' International Association of the U.S. and Canada, et al.*, 537 F.2d 669 (2d Cir. 1976); *Local 33, International Hod Carriers, etc. v. Mason Tenders District Council, et al.*, 291 F.2d 496 (2d Cir. 1961).

The defendant union (Local 100) argued that this language gave it protection because

"Local 100 is a labor organization, Connell is an employer in the construction industry, and the agreement covers only work 'to be done at the site of construction, alteration, painting, or repair of any building, structure, or other work.'" *Id.* at 627, 95 S.Ct. at 1837.

The plaintiff replied that

"despite the unqualified language of the proviso, Congress intended only to allow subcontracting agreements within the context of a collective-bargaining relationship; that is, Congress did not intend to permit a union to approach a 'stranger' contractor and obtain a binding agreement not to deal with nonunion subcontractors." *Id.* at 627–28, 95 S.Ct. at 1837.

The Supreme Court's response was that the plaintiff construction company's interpretation of the applicability of § 8(e) was correct: "§ 8(e) must be interpreted in light of the statutory setting and the circumstances surrounding its enactment." *Id.* at 628, 95 S.Ct. at 1837–38. In rejecting the defendant union's claim that agreements with "stranger" contractors were meant to be covered, the Court concluded that "[i]t is highly improbable that Congress intended such a result." *Id.* at 632, 95 S.Ct. at 1840. "[W]e think [§ 8(e)'s] authorization extends only to agreements in the context of collective-bargaining relationships and ... possibly to common-situs relationships on particular jobsites as well." *Id.* at 633, 95 S.Ct. at 1840.

If any lesson were to be drawn from *Connell* for the purposes of interpreting § 301(a), it would be that labor-law provisions covering agreements between employers and unions will not be read to cover agreements between employers and unions which do not have a mutual employer-employee relationship. Thus *Connell*, while at most an analogy, cuts in favor of affirmance here rather than reversal.

Similarly *Pacific Northwest Chapter* did not involve § 301(a). It came before the federal court of appeals upon review of an order entered by the National Labor Relations Board in an unfair labor practice proceeding in which the Board held unlawful under § 8(e) of the National Labor Relations Act union picketing pursuant to a hot cargo clause in effect between the union and construction contractors as part of their collective bargaining agreements. No issue was or could be raised as to the existence of an employer-employee relationship within the meaning of § 301(a). *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), another unfair labor practice proceeding relied upon by the dissent, likewise has no relevance to the issue before us. The issue there was interference with the right of employees under § 7 of the National Labor Relations Act, 29 U.S.C. § 157, to engage in concerted activities for the purpose of collective bargaining, over which the Board has recognized jurisdiction. This hardly supports a suit under § 301(a) for breach of contract against a party which has no relationship with the plaintiff union or its employees. We are not here confronted with an alleged unfair labor practice for violation of § 8 of the Act (e.g., discrimination against employees, interference with their right to organize, or the like) over which the Board may have jurisdiction. See *Austin Co.*, 101 N.L.R.B. 1257 (1952).

For these reasons we hold that § 301(a) does not confer federal jurisdiction over this suit by MEBA for enforcement of a contract which does not relate to employees of Grand Bassa and is not aimed at promoting labor peace "between them" (i.e., MEBA, Grand Bassa or the latter's employees), *Retail Clerks v. Lion Dry Goods, Inc.*, *supra*, 369 U.S. at 28, 82 S.Ct. at 548. MEBA's remedy lies in the state courts. The order of the district court is affirmed.

VAN GRAAFEILAND, Circuit Judge, dissenting.

Jurisdictional disputes between rival maritime unions have been a fertile source of litigation. *See, e.g., Commerce Tankers Corp. v. National Maritime Union*, 553 F.2d 793, 796–98 (2d Cir.), *cert. denied,* 434 U.S.

923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *NLRB v. National Maritime Union*, 486 F.2d 907, 909 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). These disputes often arise out of the transfer of ownership or management of ships, a common occurrence in the maritime industry. *NLRB v. National Maritime Union, supra*, 486 F.2d at 911. Collective bargaining contracts are usually fleet-wide in scope, covering the crews of all vessels in an employer's fleet. *National Maritime Union v. Commerce Tankers Corp.*, 457 F.2d 1127, 1131 (2d Cir. 1972). Under the doctrine of accretion, when another ship is added to the fleet, the union representing the fleet becomes the representative of the new ship's crew as well. *Id.* Because this is not a happy state of affairs for the disenfranchised union, it may attempt to protect its position through a contract which, in effect, mandates its continued representation of the ship's crew despite a change of ownership or management. *Id.* at 1129–30.

This litigation concerns an agreement designed to protect plaintiff Union in the event of a change in operating management. Plaintiff alleges in its complaint that, pursuant to the terms of a contract between it and the defendant shipowner, the latter agreed that it would not employ a managing agent to operate two of its ships unless that agent had a labor agreement with plaintiff, covering deck and engineer officers through June 15, 1981. By these allegations, the complaint poses on its face the crucially important question whether the contract violates the National Labor Relation Act's ban against "hot cargo" agreements. *See Danielson v. International Organization of Masters, Mates and Pilots*, 521 F.2d 747 (2d Cir. 1975); *NLRB v. National Maritime Union, supra*, 486 F.2d 907. However, because the contract was between a union and a shipowner whose vessels were being operated by an independent managing agent, my panel colleagues hold that this question cannot be answered by a federal court. I disagree.

Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides for federal jurisdiction in "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." Section 8(e) of the National Labor Relations Act, which was added in 1959, Pub.L.No. 86–257, 73 Stat. 543–44 (codified at 29 U.S.C. § 158(e)), makes it an unlawful labor practice for a union and an employer to enter into a contract or agreement under which the employer agrees to cease doing business with any other person, and makes such an agreement unenforceable and void. Defendant moved in the district court to dismiss the complaint, or alternatively for summary judgment, asserting, among other grounds, that its agreement with plaintiff is a "hot cargo" agreement, void and unenforceable under section 8(e). The district court avoided this pivotal issue of illegality by holding that it was without jurisdiction to decide it. This, I suggest, is not what Congress intended when it enacted section 301(a).

Congress and the courts have wrestled for many years with the problem of labor's excessive involvement in the affairs of persons other than employers' immediate employees. Early attempts to curb abuses by application of the Sherman Act led to the enactment of section 20 of the Clayton Act, Pub.L.No. 63–212, 38 Stat. 738 (codified at 29 U.S.C. § 52), which limits the power of federal courts to issue injunctions in labor disputes. *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 620–21, 87 S.Ct. 1250, 1255–56, 18 L.Ed.2d 357 (1967). When the Supreme Court held that section 20 was not intended to legalize secondary boycotts, *see Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n*, 274 U.S. 37, 50, 47 S.Ct. 522, 526, 71 L.Ed. 916 (1927), Congress reacted by enacting the Norris-LaGuardia Act, Pub.L.No. 72–65, 47 Stat. 70. *National Woodwork Manufacturers Ass'n v. NLRB, supra*, 386 U.S. at 622, 87 S.Ct. at 1256. Section 13(c) of that Act provided that the term labor dispute "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons

in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of an employer and employee." Pub.L.No. 72–65, 47 Stat. 73 (currently codified at 28 U.S.C. § 152(9)).

Renewed abuses by labor under the permissive terms of this provision led to the enactment of section 8(b)(4)(A) of the Labor Management Relations Act, Pub.L. No. 80–101, 61 Stat. 141 (currently codified at 29 U.S.C. § 158(b)(4)(B)), the intent of which was to eliminate the use of secondary boycotts. *National Woodwork Manufacturers Ass'n v. NLRB, supra,* 386 U.S. at 623–25, 87 S.Ct. at 1257–58. This section provides in pertinent part that it is an unfair labor practice for a labor organization to threaten, coerce, or restrain any person engaged in an industry affecting commerce with the object of forcing or requiring any person to cease doing business with any other person. However, in *Local 1976, United Brotherhood of Carpenters and Joiners v. NLRB,* 357 U.S. 93, 107–111, 78 S.Ct. 1011, 1020–22, 2 L.Ed.2d 1186 (1958), the Court held that the mere inclusion of a "hot cargo" clause in a union contract was not an unfair labor practice under section 8(b)(4)(A). To eliminate this loophole in the law, Congress enacted section 8(e), which made the "hot cargo" agreement itself unlawful except in construction industry on-site contracts and certain garment industry contracts. *National Woodwork Manufacturers Ass'n v. NLRB, supra,* 386 U.S. at 633–34, 87 S.Ct. at 1262–63.

The keen congressional interest displayed in the above summarized development of unfair labor agreements makes it most unlikely that Congress intended federal courts to have jurisdiction in an action to enforce a "hot cargo" agreement only where that agreement concerns an employer's immediate employees. I believe that this conclusion is amply supported by established case law.

In *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), Connell was a general contractor engaged in the construction industry, none of whose employees was a member of the defendant Union. The Union demanded nonetheless that Connell enter into an agreement with the Union not to do any business with any plumbing or mechanical firm unless that firm had a collective bargaining agreement with the Union. Coerced into signing by Union picketing, Connell sued for violation of the State and federal antitrust laws.

Construing the term "any employer" as used in section 8(e) to mean only the immediate employer of the employees represented by the Union, Connell argued that the agreement was not a classic "hot cargo" clause protected by the section 8(e) construction industry exception, because there was no bargaining relationship between it and the Union. *See Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100,* 483 F.2d 1154, 1172 (5th Cir. 1973). The Fifth Circuit implicitly rejected this argument by holding that the contract created an issue of labor law which should be determined in the first instance by the National Labor Relations Board. *Id.* at 1174.

When *Connell* reached the Supreme Court, every judge on the Court agreed that the Union's conduct involved a possible violation of section 8(e). The majority, in an opinion by Justice Powell, held that, while section 8(e) did not permit this type of agreement, *id.* 421 U.S. at 626, 95 S.Ct. at 1837, Congress did not intend that labor law remedies for section 8(e) violations would preclude additional remedies under the federal antitrust laws. *Id.* at 634–5, 95 S.Ct. at 1841. Justice Stewart, writing for the dissent, agreed that "the subcontracting agreement under which Connell agreed to cease doing business with nonunion mechanical contractors is covered by the provisions of § 8(e)." *Id.* at 639, 95 S.Ct. at 1843. His disagreement with the majority was based on the belief that Congress intended regulation of secondary boycott activity, such as that of the Plumbers and Steamfitters Local, to be exclusively under the Na-

**404**

tional Labor Relations Act. *Id.* at 654–55, 95 S.Ct. at 1850–51.

It is obvious that the entire Court considered Connell to be an "employer" under section 8(e) despite the fact that the contract in dispute involved none of its employees.[9] This has been the Supreme Court's consistent position under the National Labor Relations Act and its amending statutes, wherever the specific language of the statutory provision involved did not indicate a contrary congressional intent.

In *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), the Court held that the owner of a shopping center who attempted to prevent picketing by employees of one of his tenants was a statutory "employer" under the Act. *Id.* at 510 n.3 & 522 n.11, 96 S.Ct. at 1032 n.3 & 1037 n.11. In support of this holding, the Court cited *Austin Co.*, 101 NLRB 1257. There, the employer, a construction company, was held to have violated section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), by terminating the guard services of three Pinkerton Company employees. The Board, holding that section 8(a)(3) does not limit its prohibitions to acts of an employer against his own employees, observed that, when Congress intended such limitation, it made its intentions clear. *Id.* at 1258–59. *See, e.g.,* section *8(a)(5),* 29 U.S.C. § 158(a)(5), in which the term "his employees" is used, and compare with section 301(a), which concerns contracts between an employer and a labor organization representing, not "his employees", but "employees in an industry".

In the *Austin* Trial Examiner's intermediate report, he stated that if a broad interpretation of "employees" was not adopted, a dominant union in the construction industry "might uniformly insist that employees of another employer and with other repre-

sentation, not work on the project without becoming its members." *Austin Co., supra,* 101 NLRB at 1258–59.

This theme was echoed by the Fifth Circuit in *Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100, supra,* 483 F.2d at 1172 n.9, when it said:

> If the word "employer" is read to exclude Connell in the proviso, then it seems that the word "employer" in the general ban of section 8(e) would have to be read in the same manner, thus, leaving this activity totally unregulated by this section of the statute.

The ends which Congress sought to attain in prohibiting "hot cargo" agreements are the same, regardless of whether the union represents the immediate employees of the party with whom it contracts. *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB*, 609 F.2d 1341, 1350 (9th Cir. 1979). As Judge Mansfield, himself, aptly stated in *Danielson v. International Organization of Masters, Mates and Pilots, supra,* 521 F.2d at 756, the plain language of section 8(e) "proscribes the making of a 'hot cargo' agreement by 'any labor organization and any employer.'" *See also Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 878 (D.C.Cir.1980). Indeed, the fewer immediate employees represented by the union, the less justification there is for the union's anti-competitive efforts. *NLRB v. National Maritime Union, supra,* 486 F.2d at 913–14.

A "contract" for purposes of section 301 is "an agreement between employers and labor organizations significant to the maintenance of labor peace between them", *Retail Clerks International Association v. Lion Dry Goods, Inc.,* 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962), and need not

---

**9.** It should be noted that the issue before the Court in *Connell* was not whether all labor contracts relating to employees other than those of the contracting employer are outside the coverage of the National Labor Relations Act, but rather whether the Connell contract was excepted from the coverage of the "hot cargo" provisions of the Act by the construction industry exception of section 8(e). If the general rule is, as my colleagues suggest, that

"labor-law provisions covering agreements between employers and unions will not be read to cover agreements between employers and unions which do not have a mutual employer-employee relationship", there was no need for the *Connell* Court to focus on section 8(e)'s limited exception from "hot cargo" coverage. If, as the Court held, the contract in Connell did not qualify for the section 8(e) exception, it must of course have been covered by the Act.

be a collective bargaining contract. *Id.
See Drywall Tapers and Pointers v. Operative Plasterers and Cement Masons International Association*, 537 F.2d 669, 672–73 (2d Cir. 1976); *Deaton Truckline, Inc. v. Local Union 612*, 314 F.2d 418, 422 (5th Cir. 1963); *International Association of Machinists, Lodge 1652 v. International Aircraft Services, Inc.*, 302 F.2d 808, 815–16 (4th Cir. 1962).

The contract in the instant case was not for the purchase of an automobile.[10] Its undisputed objective, as testified to by defendant's vice-president, was to secure labor peace between the shipowner and operator on one hand and the Union on the other. However, in furthering this objective, the parties created a clear issue of unfair labor practice. Because I am convinced that Congress could not have intended that a defendant be treated as something other than an "employer" where enforcement of a contract is sought, but as an "employer" where enforcement of the contract is sought to be precluded, I respectfully dissent.

10. The automobile-purchase illustration in the majority opinion carries appellant's argument to an "extreme", but it is not a "logical" one. There is nothing "fuzzy" in the concept of labor peace, especially where, as here, the parties concede that to be the purpose of the agreement.