**SHEETMETAL WORKERS UNION LOCAL NO. 110 and John Grider, Plaintiffs-Appellants,**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Defendant-Appellee.**

No. 84–3056.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1985.
Decided Aug. 27, 1985.

Thomas J. Schulz, Segal Isenberg, Sales, Stewart & Cutler, Louisville, Ky., for plaintiffs-appellants.

William E. Roberts, Roberts Ryder Rogers & Scism, Indianapolis, Ind., for defendant-appellee.

Before CUDAHY and POSNER, Circuit Judges, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

Plaintiffs-appellants Local 110 (the Union) and John Grider filed a two-count complaint in federal district court against defendant-appellee Public Service Company of Indiana (PSI). Plaintiffs' first count alleged a breach of contract by PSI arising under 29 U.S.C. § 185 (section 301). Plaintiffs' second count alleged interference by PSI with Grider's contractual rights under a collective bargaining agreement negotiated by the Union and Pullman Sheetmetal Works (Pullman) and interference with Grider's rights under a Project Agreement to which the Union, Pullman, and PSI were parties. Defendant PSI moved to dismiss plaintiffs' complaint for lack of subject matter jurisdiction. The district court granted defendant's motion, concluding that PSI did not commit a breach of contract cognizable under section 301. The district court then dismissed plaintiffs' pendent claim for interference with contractual rights. Plaintiffs appeal from the district court's decision.

## I. THE FACTS

Plaintiff John Grider worked for Pullman Sheetmetal Works as a journeyman sheetmetal worker until September 6, 1983. During his employment, plaintiff was a member of Sheetmetal Workers Local Union No. 110 and possessed benefits under a collective bargaining agreement negotiated by Pullman and the Union. This collective bargaining agreement set forth the terms and conditions of Grider's employment.

An additional agreement, to which Pullman, the Union, and PSI were parties, set forth the responsibilities and rights of employers such as Pullman, unions such as Local 110, and defendant PSI with respect to construction work performed on PSI's Marble Hill nuclear generating project. This agreement, designated the "Project Agreement," required employers and unions to arbitrate any disputes arising at Marble Hill pursuant to a specified procedure. The Project Agreement furthermore reserved to PSI the right to suspend or terminate work at Marble Hill as well as the right to establish work rules and work hours. The agreement additionally prohibited fighting on PSI's premises. Finally, the agreement reserved to employers such as Pullman the exclusive authority to manage day-to-day operations.

On September 6, 1983, Grider, while working at Marble Hill, allegedly verbally and physically abused one of PSI's security guards. PSI denied Grider access to Marble Hill the next day and so informed Pullman. Pullman then examined Grider's job performance record. Because Grider's record indicated that Grider already had obtained a written warning for unrelated job misconduct, Pullman terminated Grider. Grider then filed a grievance pursuant to

the grievance and arbitration clause of the Project Agreement, protesting his discharge. PSI did not participate in these grievance proceedings. After a Local Joint Adjustment Board was unable to reach a consensus on the merits of Grider's grievance against Pullman, Grider appealed to the National Adjustment Board. The National Board dismissed Grider's grievance, finding that Pullman was not responsible for PSI's denial of site access to Grider. Grider subsequently instituted the present action against PSI, seeking to compel PSI to arbitrate his grievance, or, alternatively, seeking compensatory relief for PSI's alleged breach of and interference with Grider's contractual rights.

As we have noted, the district court dismissed Grider's complaint on the basis that it failed to state a claim arising under section 301. In so ruling, the district court determined that PSI did not agree, under the terms of the Project Agreement, to arbitrate grievances arising at Marble Hill. The district court furthermore rejected plaintiffs' argument that *Pullman's* agreement to arbitrate grievances arising at Marble Hill bound PSI because PSI and Pullman were joint employers. The district court then dismissed Grider's pendent claim for interference with contractual rights because no federal questions remained to which this tort claim could attach. Grider challenges the district court's conclusion that the Project Agreement did not obligate PSI to participate in arbitration of his grievance and additionally contends that PSI's denial of access itself constituted a breach of the Project Agreement. Grider does not contest the district court's dismissal of his pendent claim for interfer-

ence with contractual rights, however, if this court concludes that no section 301 jurisdiction exists over Count I of his complaint.

## II. CONSTRUING GRIDER'S COMPLAINT UNDER SECTION 301

■ Section 301 invests the district courts with original jurisdiction over "suits for violation of contracts between ... employer[s] and ... labor organization[s]" in industries affecting commerce.[1] 29 U.S.C. § 185 (1978). Federal courts adjudicating suits arising under section 301 must apply federal law. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). The federal law governing section 301 suits includes the remedy of specific performance for agreements to arbitrate labor-management disputes. *Id.* at 458, 77 S.Ct. at 918. Indeed, federal labor policy includes a preference for private arbitration of such disputes. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). This preference for arbitration of labor-management disputes has led the courts to presume that any dispute arising under a labor contract containing a grievance and arbitration clause is arbitrable absent express contract language to the contrary. *Id.* at 584–85, 80 S.Ct. at 1353–54.

Plaintiffs' dispute focuses on the scope of the grievance and arbitration provisions contained in the Project Agreement and, therefore, arises under a labor contract. The presumption favoring arbitrability of this dispute will not operate, however, un-

---

1. Various cases have explored whether the "between" language in section 301 refers to contracts between employers and labor organizations or to suits between such parties. *See, e.g., Loss v. Blankenship*, 673 F.2d 942, 946 (7th Cir. 1982); *Painting & Decorating Contractors Association, Inc. v. Painters & Decorators Joint Committee, Inc.*, 707 F.2d 1067, 1070–71 n. 2 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984); *District 2 Marine Engineers Beneficial Association-Associated Maritime Officers v. Grand Bassa Tankers, Inc.*, 663 F.2d 392, 395–98 (2d Cir.1981). In the case

before us, a labor organization alleges violation of a contract binding it, an employer, and the owner of a construction site. Because the parties negotiated this contract in order to maintain industrial peace, *compare Grand Bassa Tankers*, 663 F.2d at 399–401, this court finds that the contract falls within the jurisdiction conferred by section 301, even though defendant did not employ plaintiff union's members. Finding that section 301 covers this contract, however, is merely a preliminary step to determining whether plaintiffs have stated a cause of action for its breach.

less defendant PSI in fact agreed to bind itself to those grievance and arbitration provisions. *See Oil, Chemical & Atomic Workers International Union v. American Maize Products Co.*, 492 F.2d 409, 412 (7th Cir.1974), *cert. denied*, 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140. As the Supreme Court noted in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. at 582, 80 S.Ct. at 1353, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."

■ After examining the language used in the Project Agreement's grievance and arbitration provisions, this court can only conclude that PSI did not agree to arbitrate any disputes arising between it and other signatories to the Agreement. The grievance and arbitration provisions neatly set forth what procedures grievants must follow, but refer exclusively to representatives of the "employee" and the "employer." The preamble to the Agreement defines these parties specifically—"employee" referring to members of the local unions and "employer" referring to the various contractors and subcontractors performing work at Marble Hill. The Agreement additionally denotes PSI as "owner" of the Marble Hill project. Because the grievance and arbitration provisions of the Project Agreement bind only representatives of employees and representatives of employers, the provisions do not bind PSI. As a result, the presumption favoring arbitrability of labor disputes does not apply to this case, and the district court correctly declined to order PSI to arbitrate Grider's grievance.

Indeed, an identical issue confronted this court merely two years ago. *See General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Public Service Co.*, 705 F.2d 238, 241 (7th Cir.1983) (*Teamsters*). In *Teamsters*, a union signatory to the

Project Agreement sought to compel PSI to arbitrate a dispute stemming from PSI's decision to discontinue the union's warehousing services. This court scrutinized the grievance and arbitration provisions of the Project Agreement and determined that "the language of the ... Agreement compel[led] the conclusion that the 'Owner' (PSI) ha[d] no obligation to arbitrate grievances." *Id.* at 241. We reaffirm that decision and once more conclude that PSI did not agree to arbitrate disputes arising under the Project Agreement.[2]

Plaintiffs argue, however, that notwithstanding the lack of a personal obligation on PSI's part to arbitrate grievances arising under the Project Agreement, *Pullman's* obligation to arbitrate such grievances should bind PSI because Pullman and PSI were joint employers of Grider. In this sense, plaintiff argues, Pullman's agreement to arbitrate contract grievances binds PSI just as if PSI agreed to arbitrate such grievances itself.

The National Labor Relations Board (the Board) articulated this "joint employer" theory in order to render entities exerting significant control over the employees of a nominally independent employer subject to the National Labor Relations Act. *See, e.g., Western Union Corp.*, 224 N.L.R.B. 274 (1976); *Milo Express, Inc.*, 212 N.L.R.B. 313 (1974). *See also Davis v. N.L.R.B.*, 617 F.2d 1264, 1271 (7th Cir.1980). The Board considers four factors in determining whether a joint employer relationship exists. These factors include:

(1) an interrelationship of operations;

(2) common management;

(3) centralized control of labor relations; and

(4) common ownership.

*See Teamsters*, 705 F.2d at 241; *Metropolitan Detroit Bricklayers District Council, International Union of Bricklayers v.*

**2.** As counsel for PSI correctly pointed out at oral argument, PSI could never realistically embroil itself in all grievances arising under the Project Agreement in view of the huge numbers of "employees," "unions," and "employers" involved. Counsel estimated, for example, that seventy-odd contractors might have worked simultaneously at Marble Hill during the course of the Marble Hill project.

*J.E. Hoetger & Co.*, 672 F.2d 580, 584 (6th Cir.1982). The Board has indicated that the critical factor among these four is centralized control of labor relations. *Gerace Construction, Inc.*, 193 N.L.R.B. 645 (1971).

Applying these factors to the case before us, we first conclude that no significant interrelationship of operations existed between PSI and Pullman at Marble Hill. As we previously observed, the Project Agreement reserved to employers such as Pullman exclusive control over day-to-day construction operations. PSI's ability to establish uniform work rules and work hours at Marble Hill, and its ability to terminate operations, did not significantly enmesh PSI's operations with the operations of the contractors performing construction work at the Marble Hill project. *See Teamsters*, 705 F.2d at 242 (concluding that PSI's ability to establish work rules suggested only PSI's belief that uniformity of rules and hours was essential to the success of the project). We remark that several cases declining to find joint employer status involve operations considerably more interrelated than the operations between Pullman and PSI. *See Metropolitan Detroit Bricklayers District Council, International Union of Bricklayers v. J.E. Hoetger & Co.*, 672 F.2d 580 (6th Cir.1982) (where a general contractor had the power to escrow funds paid to a subcontractor to ensure the payment of fringe benefits to the subcontractor's union employees). Moreover, the cases concluding that a joint employer relationship does exist commonly involve parent and subsidiary corporations, or corporations linked by common controlling shareholders and corporate officers. *See N.L.R.B. v. Triumph Curing Center*, 571 F.2d 462 (9th Cir.1978); *N.L.R.B. v. R.L. Sweet Lumber Co.*, 515 F.2d 785 (10th Cir.1975), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302. The parties agree that these circumstances are absent in the present case.

The parties also concede that PSI and Pullman do not otherwise share common ownership or common management. The parties dispute, however, whether PSI's ability to deny access to employees, to discontinue operations, and to establish uniform work rules at Marble Hill exhibit a centralized control of labor relations at the Marble Hill project.

In *Teamsters*, these factors did not convince this court that PSI controlled labor relations at Marble Hill and was therefore a joint employer of union employees. *Id.* 705 F.2d at 242. We observed in *Teamsters* that PSI did not participate in the negotiation of collective bargaining agreements between its contractors and the local unions. *Id.* Those agreements, as in this case, established the terms and conditions of union members' employment. We additionally observed that the Project Agreement reserved to the contractors control over all labor relations functions. *Id.* These circumstances likewise characterize PSI's relationship with Pullman and the Union.

▮ Plaintiffs contend, however, that this case is unlike *Teamsters* because PSI acted as an employer in this case by denying access to Grider but acted as an owner in *Teamsters* by discontinuing warehousing services. We note that PSI's decision, challenged in *Teamsters*, to discontinue warehousing services provided by a local union resulted in the lay-off of nine employees. Here, PSI's decision to deny access to Grider resulted in Pullman's termination of Grider's employment. Although PSI directed its action in this case against an identified union employee, this court cannot conclude that PSI, by its action, controlled labor relations at Marble Hill and thereby became a joint employer. PSI's decision to deny access to Grider for security reasons appears to this court to fall within a property *owner's* prerogative to exclude undesirable individuals from his or her property. This court accordingly cannot conclude that PSI acted as an employer as opposed to an owner in denying site access to Grider.

▮ Because PSI did not control labor relations at Marble Hill and did not otherwise assume management of Pullman's operations, the district court correctly con-

cluded that Pullman and PSI were not joint employers of Grider. Pullman's agreement to arbitrate grievances arising under the Project Agreement therefore did not bind PSI. Furthermore, because PSI did not independently agree to arbitrate such grievances, PSI's refusal to participate in arbitration of Grider's grievance did not breach the Project Agreement. *See Teamsters*, 705 F.2d at 243.

This court likewise concludes that PSI's denial of site access to Grider did not otherwise breach the Project Agreement. The Project Agreement reserved control over day-to-day operations, such as hiring and firing, to contractors such as Pullman. *Id.* at 242. As we previously observed, Pullman and not PSI terminated Grider's employment. Although PSI's decision to deny site access to Grider induced Pullman to examine Grider's employment record and, subsequently, to terminate Grider's employment, we find that primary responsibility for Grider's loss of work lies with Pullman and not PSI.

■ We acknowledge, of course, that the National Joint Adjustment Board denied Grider's grievance against Pullman on the theory that PSI and not Pullman denied access to Grider. The merits of that decision, however, are not before this court. The sole issue before this court, as we have indicated, is whether PSI's denial of site access to Grider breached the Project Agreement. We have examined the terms of that agreement and the interpretation of those terms by this court in *Teamsters. See id.* at 242. Because the agreement allocated full responsibility for hiring and

firing to contractors such as Pullman, and contained no explicit or implied assurance that PSI would not deny access to union employees without just cause, we conclude that PSI's denial of access to Grider did not breach the Project Agreement. The district court, therefore, properly dismissed plaintiffs' section 301 claim against PSI.

### III. PLAINTIFFS' PENDENT CLAIM

Plaintiffs also filed a pendent claim against PSI for tortious interference with contractual rights.[3] The district court, however, dismissed this claim, following the pretrial dismissal of plaintiffs' claims for relief under section 301. Plaintiffs do not appeal the district court's dismissal of this pendent claim if we conclude that no section 301 jurisdiction existed over Count I of their complaint. We have so concluded. As a result, no further contentions remain before this court.

### IV. CONCLUSION

This court finds that the district court correctly determined that plaintiffs' complaint against defendant PSI failed to state a claim under section 301. This court accordingly AFFIRMS the district court's dismissal of plaintiffs' complaint.

CUDAHY, Circuit Judge, dissenting:

I cannot agree that Pullman and PSI were not joint employers of Grider. The National Joint Adjustment Board denied Grider's grievance against Pullman on the theory that PSI and not Pullman denied access to Grider.[1] Although the majority declines to examine the merits of this decision, it seems to me eminently realistic.

---

**3.** Some courts treat claims for interference with rights guaranteed by contracts falling within the jurisdiction conferred by section 301 as section 301 claims, within the original jurisdiction of the district courts. *See Wilkes-Barre Publishing Co. v. Newspaper Guild, Local 120*, 647 F.2d 372, 381 (3d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982). This court has not adopted that analysis. *Loss v. Blankenship*, 673 F.2d 942, 946 (7th Cir.1982). In any event, because plaintiffs do not contend that pre-trial dismissal of their section 301 claim, this issue is not properly before this court.

**1.** The November 28, 1983, decision of the adjustment board read as follows:

> After consideration of the presentations, the panelist[s] agree that Pullman Sheet Metal Works, Inc., is not in violation of the Agreement and that John Grider was not discriminated against and wrongfully discharged by Pullman. Pullman would not have terminated Grider had PSI not denied him access to the site.

> The joint effect of the board decision and today's result is effectively to deny Grider the remedy guaranteed him in the grievance procedures.

And I have difficulty with the majority's somewhat metaphysical surmise that PSI acted as a property owner and not as an employer when it denied Grider access to his job site.[2] Whether PSI dismissed Grider for security reasons or whether Pullman dismissed him for abusing a security guard is six of one and a half a dozen of the other. In the circumstances of this case, PSI certainly controlled the working conditions at Marble Hill.

The law governing labor relations has generally been characterized by a willingness to look through form to substance. In addition, there has been a reluctance to allow persons acting as employers to contract away their responsibilities. The majority is certainly correct in opining that PSI should not be expected to accept labor relations responsibility for the employees of all its numerous contractors, but in the circumstances of this case there is no good reason it should not be charged with joint responsibility. To hold otherwise is to deny Grider the elementary protections of a grievance procedure.

I therefore respectfully dissent.

**2.** In the *Teamsters* case, cited by the majority, PSI terminated the services of a contractor, and as a result the contractor's employees were thrown out of work. It is something of a leap to conclude that because PSI was not acting as an employer in those circumstances it was not acting as an employer in these.