OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, and Local 7-210, Oil, Chemical and Atomic Workers International Union, AFL–CIO, unincorporated labor organizations, Plaintiffs-Appellants,

v.

AMERICAN MAIZE PRODUCTS COMPANY, Defendant-Appellee.

No. 73–1140.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1974.

Decided Jan. 28, 1974.

Gilbert A. Cornfield, Chicago, Ill., for plaintiffs-appellants.

Daniel F. Kelly, Hammond, Ind., for defendant-appellee.

Before SWYGERT, Chief Judge, KILEY, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

The plaintiff-unions have appealed from the granting of defendant-employer's motion for summary judgment in an action which the unions brought under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185,[1] to compel the employer to arbitrate a grievance under the terms of a collective bargaining agreement.[2]

The collective bargaining agreement between the parties, effective August 1, 1970, set forth the terms and conditions of employment of 481 employees in the bargaining unit at the employer's Roby, Indiana, plant. The agreement provided a procedure for processing grievances (Article IX) and for submission to final and binding arbitration of all unsettled grievances (Article XII). Article XIII provided:

"The Company agrees that during the term of this Agreement there shall be no lockouts.

"The Union agrees that during the term of this Agreement there shall be no strikes, slowdowns, or work stoppages for any reason whatsoever."

Article XXIII provided:

"This Agreement shall be effective upon the day of its execution and shall continue in effect, subject to the provisions of the Article on Contract Reopening, until August 1, 1972, and thereafter unless and until sixty (60) days' prior written notice is given by either party that it desires to amend

or terminate this Agreement. Sixty (60) days prior to August 1, 1972, or any time thereafter by giving sixty (60) days' notice either party hereto may give notice as follows:

"(a) To amend certain sections or articles of this Agreement, only, or

(b) To terminate the entire Agreement.

"In the event notice is given to amend only this Agreement, except Article XIII concerning strikes and lockouts, shall continue to be in full force and effect. In the event no agreement can be reached on the Articles and Sections sought to be amended, the Union shall have the right to strike.

"In the event notice is given to terminate, the entire Agreement shall be void and of no effect as of the effective date of the notice . . . ."

On May 22, 1972, the local union gave the following 60-day notice:

"Pursuant to the provisions of the Labor Management Relations Act of 1947, you are hereby notified that we desire to modify the collective bargaining contract now in effect between your Company and this Union, in accordance with the provisions of the Agreement.

"We shall be glad to and now offer to meet and confer with you for the purpose of negotiating a new contract or modifications to the present Agreement."

Subsequent to the notice, the parties entered into contract negotiations. No agreement having been reached, the union on July 29, 1972, served a 72-hour notice of intent to strike after midnight on August 1, 1972.[3] Thereafter, some

---

1. Section 301(a) provides in part that "Suits for violations of contracts between an employer and a labor organization . . . may be brought in any district court of the United States . . . ."

2. Section 301(a) confers power upon district courts to compel arbitration in accordance with the terms of a collective bargaining agreement. Textile Workers Union of

America v. Lincoln Mills, 353 U.S. 448, 451 (1957).

3. Article XXIII of the collective bargaining agreement also provided: "Upon termination of the Working Agreement for any cause, or at any time, the Union shall have the right to strike under the terms of such Agreement. No strike shall be called unless the Company shall have first had at least seven-

progress was made in the negotiations and the union hand delivered at 9:20 P. M. on July 31, 1972, a written withdrawal of the 72-hour notice to strike. At approximately 10:15 P.M., the employer advised the union that it could not unilaterally withdraw the 72-hour notice of strike and that the employer considered the union to be on strike as of 12:01 A. M. on August 1, 1972. On the night of July 31, 1972, when the employees came to work, some as early as 11:10 P.M., they found the gates of the plant closed and they were refused admittance to work.[4]

The union filed a grievance with the employer on August 8, 1972, stating that the employer had unlawfully locked out the employees in violation of the collective bargaining agreement. The employer refused to consider the grievance or to submit it to arbitration, whereupon, the unions' complaint was filed in the district court on August 31, 1972.

Both parties filed motions for summary judgment supported by affidavits, resulting in the district court's granting of the employer's motion and denying of the unions' motion. The district court held that regardless of whether the local union's May 22, 1972 notice was considered a notice to amend or a notice to terminate under Article XXIII, the no-strike-or-lockout provision in Article XIII would have terminated in accordance with Article XXIII and hence the shutdown of the plant resulted in a dispute under a terminated provision, which dispute the court held to be non-arbitrable.

The unions appealed and argued (1) that the district court lacked jurisdiction to determine whether the unions' grievance was arbitrable and (2) that

the district court erred in concluding that the grievance was not arbitrable because "Article XIII [no strike or lockout provision] expired with the last shift on July 31, 1972." The essence of the unions' second argument was that even if lockouts were permissible under the contract upon a notice to amend (which the unions denied), the present dispute was arbitrable since the remainder of the contract continued in full force and effect and the grievance encompassed the right of the employer to hire temporary replacements during the lockout.[5]

■ In regard to the unions' first argument, it is well established that "whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L. Ed.2d 462 (1962).

In regard to the unions' second argument, we agree with the district court's conclusion but for a different reason.

■ The local union's notice of its offer to meet with the employer "for the purpose of negotiating a new contract or modifications to the present Agreement" was a notice to terminate under Article XXIII inasmuch as a notice "to amend certain sections or articles . . . only" would have at the very least required a designation of the sections or articles desired to be amended. To speak of modifying or the modification of the present agreement without any specification of portions to be modified could only mean the modification of the entire agreement and hence the termination of that agreement and the substitution of a new agreement.

---

ty-two (72) hours written notice of the Union's intent to call a strike."

4. In view of our decision hereinafter, it is not necessary to decide whether the union had the right to unilaterally withdraw the 72-hour notice of strike or whether the

shutdown of the plant was the result of a union strike or an employer lockout.

5. *Compare* Inland Trucking Co. v. N.L.R.B., 440 F.2d 562 (7th Cir. 1971) *with* Inter-Collegiate Press v. N.L.R.B., 486 F.2d 837 (8th Cir. 1973).

In Baker v. Fleet Maintenance, Inc., 409 F.2d 551 (7th Cir. 1969), the language of the union notice in a similar situation stated a desire to negotiate a "new contract . . . modifying the current contract . . . ." After finding that "the district court had a sufficient basis upon which to determine whether a collective bargaining agreement was in existence" at the time of the grievance, we held that "no reasonable construction can be given to these documents except that the parties intended . . . to give notice of the Union's desire to terminate the contract . . . ." 409 F.2d at 554.

In Paterson Parchment Paper Co. v. International Brotherhood, 191 F.2d 252 (3rd Cir. 1951), cert. denied, 342 U.S. 933, 72 S.Ct. 376, 96 L.Ed. 694 (1952), the court in a similar situation held that a notice that the union "desires a meeting with the Company for the purpose of discussing changes in the contract for the coming year" constituted a notice of termination of the contract.

Here the local union in its letter to the employer on July 31, 1972, stated that it "is herewith withdrawing the 72 hour notice to *terminate* the current contract . . . ." Inasmuch as the 72-hour notice to strike did not refer to termination, the July 31 letter, which withdrew, or at least purported to withdraw, the 72-hour notice to strike, did not withdraw, nor purport to withdraw, the May 22 notice, which was obviously being characterized as a "termination" notice by the union itself.

We hold that the only reasonable construction which can be given to the May 22 letter is that it constituted a notice of termination. Hence under Article XXIII, the collective bargaining agreement terminated as of after midnight on August 1, 1972. ". . . [A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

We accept the district court's finding that the contract terminated with the last shift on July 31, 1972.[6] Therefore the fact that employees appeared at the plant as early as 11:10 P.M., on July 31, did not alter the fact that these employees were scheduled under the terms of the collective bargaining agreement to commence work after midnight on August 1, 1972, at which time the agreement had terminated. The grievance, whether based on the shutdown commencing after midnight on August 1 or on the temporary replacements in the unit thereafter, occurred after the termination of the agreement and was not arbitrable.

The judgment order granting the employer's motion for summary judgment is affirmed.

Affirmed.

---

6. The district court found: "The original provisions of the Agreement provided that first shifts would start at 12:00 midnight each day (Articles II and III). At oral argument the Union represented to the Court and it was not disputed by the Company that by agreement of the parties and pursuant to the terms of the Agreement, production employees' shifts were to commence at 11:30 p. m. The earliest that these employees could report to work for this shift was 11:10 p. m. All other employees retained the original shift time of 12:00 midnight.

"Based on this modification of the shift time, production employees began to report for work for the first shift of August 1, 1972 at 11:10 p. m. on July 31, 1972. At this time the plant gates were closed and these employees were refused entrance to the plant to work."