**ROLLIE WINTER & ASSOCIATES, LTD., Plaintiff,**

v.

**FOX RIVER VALLEY BUILDING & CONSTRUCTION TRADES COUNCIL, Defendant.**

No. Civ.A. 98–C–132.

United States District Court, E.D. Wisconsin.

July 28, 1999.

Charles D. Koehler, Herrling, Clark, Hartzheim & Siddall, Appleton, WI, for plaintiff.

Matthew R. Robbins, Previant, Goldberg, Delmen, Gratz, Miller & Brueggeman, Wilwaukee, WI, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and DENYING PLAINTIFF'S MOTION TO REMAND

REYNOLDS, District Judge.

### I. INTRODUCTION

Plaintiff Rollie Winter & Associates, Ltd. ("Winter & Associates"), brings several causes of action against defendant Fox River Valley Building & Construction Trades Council ("the Trades Council"). Winter & Associates filed this action in the State of Wisconsin Circuit Court for Outagamie County. The Trades Council removed the action to this court, asserting the presence of federal jurisdiction pursuant to § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). Winter & Associates did not object to removal at

that time. Currently before the court are a motion by the Trades Council for summary judgment and a motion by Winter & Associates to remand this action to state court. The court denies the motion to remand and grants summary judgment in favor of the Trades Council as to all of Winter & Associates' claims.

## II. SUMMARY JUDGMENT STANDARD

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Even if some facts are in dispute, entry of summary judgment is in order if the movant either establishes uncontroverted facts entitling it to summary judgment or demonstrates that the non-moving party has failed to make a sufficient showing on an essential element of its case with respect to which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The court must draw all reasonable inferences from the record in favor of the nonmoving party. *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 150 (7th Cir.1994).

## III. FACTUAL BACKGROUND[1]

The dispute in this action grows out of an agreement between the Trades Council and Winter & Associates regarding the construction of a building for the Fox River Valley Technical College. Winter & Associates is in the real estate brokerage and development business. Winter & Associates regularly contracts to have structures built, which it then owns and leases. Stephen Winter ("Winter") is the sole owner and president of Winter & Associates. The Trades Council is an unincorporated association comprised of various trade unions. David Lotzer ("Lotzer") is the Trades Council's executive director. As executive director, Lotzer acts as the liaison between the Trades Council's members and general contractors, owners, and developers of construction projects in the Fox River Valley region of Wisconsin.

In August or September of 1995, Lotzer learned that the Fox River Valley Technical College was negotiating with Winter & Associates to construct a building in Clintonville, Wisconsin (hereinafter "the tech college project" or "the project"). Winter & Associates was to construct the building and lease it back to the college. Lotzer decided to contact Winter & Associates to discuss the possibility of having the Trades Council subsidize a portion of the construction costs for the tech college project. The effect of such funding would be to lower

1. For the most part, the background facts are taken from the parties' proposed findings of fact. *See* Local Rule 6.05 (E.D.Wis.). When there is no objection to proposed findings of fact, the court accepts them as true. Local Rule 6.05(d). In the background section, undisputed background facts do not contain citations; quoted or disputed facts do. Citations are also provided for undisputed facts that are supported by the record but not included in the parties' proposed findings. As to disputed facts, the court reviewed the portion of the record cited in support. Any factual statements which are disputed and do not have support in the record were disregarded by the court for purposes of this decision. If a disputed fact proposed by plaintiff is supported by the portion of the record cited, the court, for purposes of deciding this summary judgment motion, accepts the plaintiff's version as true.

the cost of labor on the project. Lotzer promised to provide Winter & Associates with Trades Council funding if Winter & Associates met certain conditions. Just what those conditions were is at the center of this dispute. Unfortunately for the parties, they did not commit their agreement to writing.

The funds the Trades Council offered to Winter & Associates are called "job targeting" funds. The Trades Council asserts that Lotzer made it clear to Winter that the Trades Council would provide these funds for the project only if Winter & Associates employed a union general contractor and all union subcontractors. Winter & Associates contends that Lotzer never informed Winter of the need to hire all union subcontractors.

The bulk of the Trades Council's evidence consists of Lotzer's deposition testimony describing his conversations with Winter regarding the project, handwritten notes that Lotzer made on or shortly after the dates the conversations took place, and letters written by Winter to the general contractor for the project. (*See* Oct. 28, 1998 Matthew R. Robbins Aff. ("Robbins Aff."), David T. Lotzer Dep. ("Lotzer Dep.") at 8.)

Lotzer had his first meeting with Winter on October 18, 1995. In his deposition, Lotzer describes the meeting as follows:

> I had told [Winter] how we could assist in this project, and I had told him at that time that targeting funds would be available, if he agreed to have this project built using all union contractors.

(*Id.* at 11.) Lotzer's notes describing the meeting state that Lotzer told Winter:

> [I]f he would agree to the project being all [u]nion we can help lower the cost to him by … targeting … I explained that upon completion of the project and

awards of contracts are [u]nion [sic], then we would cut a check payable to Winter & Associates.

(*Id.*, Ex. 1.) Winter & Associates does not dispute that this meeting occurred, (*compare* Oct. 28, 1998 Def.'s Proposed Findings of Fact ("DFOF") ¶ 9, *with* Dec. 1, 1998 Pl.'s Resp. to Def.'s Proposed Findings of Fact ("PFOF I") ¶ 9), and presents no evidence to refute Lotzer's description of the meeting.[2]

On December 6, 1995, the members of the Trades Council met and voted to approve job targeting funds for the tech college project, "with the condition that it be all [u]nion." (Robbins Aff., Lotzer Dep., Ex. 14.) Shortly thereafter, members of the Trades Council committed approximately $45,000 in job targeting funds for the project. (Robbins Aff., Lotzer Dep. at 13–14.)

On January 9, 1996, Lotzer and Winter had a telephone conversation regarding the job targeting arrangement for the project. Lotzer describes the conversation as follows:

> My understanding of that dialogue, and I know it was [Winter's] understanding of this dialogue, [was] that if this project was to be built, using all union subcontractors, that $45,000 would be coming from [the] Trades Council to Steve Winter upon completion.

(*Id.* at 11.) Winter & Associates does not dispute that this meeting occurred, (*compare* DFOF ¶ 12, *with* PFOF I ¶ 12), and presents no evidence to refute Lotzer's description of the meeting.[3]

On February 16, 1996, Winter selected a general contractor, Midstate Construction ("Midstate"), to supervise the project. Midstate was a union contractor and, thus, was acceptable to the Trades Council. Midstate was not a party to the targeting

---

2. The portions of the record cited by Winter & Associates in response to the Trades Council's proposed finding of fact do not address the content of the October 18, 1995 meeting.

3. The portions of the record cited by Winter & Associates in response to the Trades Council's proposed finding of fact do not address the content of the January 9, 1996 conversation.

agreement between Winter & Associates and the Trades Council. The contract between Midstate and Winter & Associates gave Winter & Associates the power to block Midstate's choice of subcontractors; the contract states, "[t]he Contractor shall not contract with any Subcontractor to whom the Owner or Architect has made reasonable and timely objection." (Robbins Aff., Dep. of Douglas Larson, Ex. 4 at 8, Article 11.)

On February 19, 1996, Lotzer and Winter met again to discuss the Trades Council's job targeting funds. Lotzer's notes of the February 19 meeting state:

Told [Winter] that [I] would call Doug Larson of Midstates to make sure [u]nion sub contractors would do the work per our agreement. And if so we could give a target check when completed. [Winter] agrees and understands rules.

(Robbins Aff., Lotzer Dep., Ex. 1 at 4.) Lotzer states that only he and Winter were present at their meeting. (*See* Robbins Aff., Lotzer Dep. at 39.)

Winter & Associates suggests that Midstate's president, Doug Larson ("Larson") was also present at a meeting with Lotzer, Winter, and a fourth person[4] on February 19. At that meeting, according to Winter & Associates, Lotzer stated that Winter & Associates would receive the targeting funds if it "hired a union contractor," and never mentioned the need for union subcontractors. (Dec. 1, 1998 Aff. of Charles D. Koehler ("Koehler Aff."), Douglas Larson Dep. ("Larson Dep.") at 85.) Winter & Associates does not make clear whether it is suggesting this was the same meeting to which Lotzer referred in his deposition, or some other meeting that same day. In addition, the evidence Winter & Associates presents does not make clear whether the meeting actually occurred on February 19. Winter & Associates' evidence of this meeting is the deposition testimony of Larson. At that deposition, an attorney suggested in a question to Larson that the meeting occurred on February 19. That exchange was as follows:

[Attorney:] At that February 19th meeting, did Mr. Lotzer say to either you or Mr. Winter that his $45,000 commitment was conditioned upon using 100 percent union subcontractors?

[Larson:] No.

(Koehler Aff., Larson Dep. at 86.) Although Larson made no effort to correct the date asserted by the attorney, Larson also testified that he cannot remember exactly when the meeting occurred. Larson estimates the meeting took place within a week or so after the bids were let, in approximately mid to late February. (*Id.* at 58.)

According to Larson, the purpose of his meeting with Winter and Lotzer was to approve Midstate as general contractor for the job. (*Id.* at 61.) Larson states that at the meeting, "[Lotzer] said that he would contribute or that they would contribute $45,000 to this project if Steve Winter hired a union contractor." (*Id.* at 85.) Larson states that Lotzer never mentioned union subcontractors being a condition of the targeting funds. However, Larson states that Lotzer asked him if Midstate was a union contractor, and said that if Midstate needed help locating subcontractors, that Larson could rely on Lotzer for help. (*Id.* at 61.) Larson states that he "did not make the deal with Steve Winter or David Lotzer. That was between those two . . . ." (*Id.* at 69.)

Winter & Associates also provides Winter's deposition testimony regarding his February 19 meeting with Lotzer. In that testimony, Winter does not specify whether he met only with Lotzer, or with Lotzer and Larson. Winter states that at this February 19 meeting, Lotzer never indicated that the $45,000 in targeting funds

---

**4.** Larson believes the fourth person was either Bob Martin or Mike Kowalski. The record suggests that Bob Martin works for the Fox River Valley Technical College, and that Mike Kowalski works for a company called Ten Construction.

would not be paid if Midstate used nonunion subcontractors.

Soon after the project got underway, Lotzer learned that Midstate intended to use some nonunion subcontractors. Lotzer called Winter on March 18, 1996 to tell him "that per our agreement ... this contracting by Midstate has to be all union." (Robbins Aff., Lotzer Dep. at 22.) According to Lotzer, Winter replied that he understood those terms of their agreement and would call Midstate regarding the matter. (*See id.*) Winter & Associates has not contested the Trades Council's account of this conversation.

In a letter to Larson dated May 9, 1996, Winter complained about Midstate's use of nonunion subcontractors. The letter states:

As you knew from the beginning, the Fox Valley Technical College job requires "an open book" accounting. It also requires you to submit certified payrolls to Dave Lotzer for the target funds reimbursement. You have been aware of this responsibility from the beginning of this project, and we are not going to be caught in the middle of this.... You have already broken your promise to use all union subcontractors ....

(*Id.*, Ex. 17.) Winter & Associates, however, never invoked the provision of its contract with Midstate that permitted it to block Midstate's choice of subcontractors.

Work on the project was completed in September of 1996. Several nonunion subcontractors performed work on the project. On September 17, 1996, Lotzer wrote Winter & Associates that the Trades Council would not contribute targeting funds to the project due to the use of nonunion subcontractors. Two months later, in a letter dated November 19, 1996, Winter again wrote to Larson regarding Midstate's failure to use union subcontractors. Winter wrote:

There was clearly an obligation on Midstate Corporation's part to use union labor on this project. The union target funds are for this purpose and Midstate Corporation clearly understood that and had an obligation to keep a history of the hours on the project and submit them to the Trades Council. The fact that many nonunion subcontractors were used is the basic reason target funds have not yet been paid.

(Robbins Aff., Stephen Winter Dep., Ex. 32.)

## III. ANALYSIS

Winter & Associates seeks to recover against the Trades Council under a variety of state common-law theories. Winter & Associates brings claims for breach of contract, promissory estoppel, negligent misrepresentation, intentional misrepresentation, and strict responsibility misrepresentation. The Trades Council argues that the federal Labor Management Relations Act ("LMRA") preempts all of Winter & Associates' claims with the exception of its claim for breach of contract. As for the breach-of-contract claim, the Trades Council argues that it cannot be found to have breached the contract entered into by the parties.

### A. Jurisdiction Under Section 301(a) of the LMRA

■ The Trades Council removed this action from state court on the basis that Winter & Associates' claims fell within the scope of § 301(a) of the LMRA, 29 U.S.C. § 185(a). Winter & Associates argues, without any supporting authority or evidence, that § 301(a) does not apply to the contract at issue in this action because the Trades Council is not a "labor organization" for purposes of the statute and, even if it is a "labor organization," the Trades Council does not represent any of Winter & Associates' employees.

Section 301(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees ... may be brought in any district court of the Unit-

ed States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

■ 29 U.S.C. § 185(a). The LMRA defines a "labor organization" as "any organization of any kind ... in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). The Seventh Circuit interprets this definition "very broadly." *Electromation, Inc. v. N.L.R.B.*, 35 F.3d 1148, 1159 (7th Cir.1994). A labor organization need not engage in collective bargaining to fall within this definition. *See id.* The Fifth Circuit has held that a union trades council is a "labor organization" for purposes of the statute. *See N.L.R.B. v. Metallic Bldg. Co.*, 204 F.2d 826 (5th Cir.1953).

The Trades Council is an association of twenty-six labor unions representing employees in the building and construction trades industry. (*See* Dec. 18, 1998 Def.'s Reply Br., Aff. of David T. Lotzer ¶ 3.) The Trades Council engages in a variety of interactions with employers regarding the wages, benefits, job security, and working conditions of its members' employees. (*See id.* ¶ 5.) Given the Trades Council's important role in dealing with employers, the court finds that the Trades Council is a "labor organization" for purposes of § 301(a).

■ The court also rejects Winter & Associates' contention that § 301(a) does not apply because the Trades Council does not represent any of Winter & Associates' employees. Winter & Associates cites no authority for its position. Case law from the Seventh Circuit suggests that an employer and a labor organization may be covered by § 301(a) even where the labor organization does not represent the employer's employees. *See Sheetmetal Workers Union Local No. 110 v. Public Service Co. of Indiana*, 771 F.2d 1071,

1073 n. 1 (7th Cir.1985). Instead, the focus of § 301(a) is on the nature of the contract itself. The statute encompasses "any 'agreement between employers and labor organizations significant to the maintenance of labor peace between them.'" *McNealy v. Caterpillar, Inc.*, 139 F.3d 1113, 1121 (7th Cir.1998) (quoting *Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods*, 369 U.S. 17, 28, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962)). The contract at issue in this action is a "job targeting agreement." The Trades Council describes job targeting as "a process by which a union or association of unions provides funds to an owner or contractor of a construction project as an incentive for the construction work to be done entirely by unionized employees." (Oct. 28, 1998 Def.'s Proposed Findings of Fact ¶ 9.) In other words, job targeting is a nonconfrontational method of increasing the use of union labor. It is a friendly alternative to picket lines and strikes. As such, job targeting agreements are significant to the maintenance of labor peace and come within the scope of § 301(a). Therefore, the court has jurisdiction over this action, and the court will deny Winter & Associates' motion to remand.

### B. Claims for Promissory Estoppel and Misrepresentation

■ The Trades Council argues that all of Winter & Associates' state-law claims, other than its claim for breach of contract, are preempted by the LMRA. Those claims are for promissory estoppel, negligent misrepresentation, intentional misrepresentation, and strict responsibility misrepresentation. Winter & Associates' only response to the Trades Council's argument is its previously-discussed, and dismissed, contention that § 301(a) does not apply to this action.

■ Section 301(a) preempts a wide variety of state-law claims involving labor contracts. The statute's broad preemptive sweep flows from the policies behind the

LMRA, which require that federal law govern labor-contract disputes in order to ensure uniformity and predictability in contract interpretation. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 210–11, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). Thus, the *Lueck* Court held:

[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id.* at 211, 105 S.Ct. 1904. The general rule established in *Lueck* is that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law." *Id.* at 220, 105 S.Ct. 1904 (internal citation omitted).

■ In this action, Winter & Associates' claims for promissory estoppel and misrepresentation must be dismissed as preempted by § 301(a) because those claims all require the court to determine the substance of the parties' job targeting agreement. A claim for promissory estoppel under Wisconsin law requires that "[t]he promisor must make a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee." *Kramer v. Alpine Valley Resort, Inc.,* 108 Wis.2d 417, 422, 321 N.W.2d 293, 295–96 (1982). Similarly, the various forms of misrepresentation all require the defendant to have made an untrue factual representation and the plaintiff to have relied on that representation to his or her detriment. *See Grube v. Daun* 173 Wis.2d 30, 53–54, 496 N.W.2d 106, 114 (Ct.App.1992). In all of these causes of action, the central question is: What was the promise or representation made by the

defendant? That inquiry is identical to the central dispute in Winter & Associates' breach-of-contract claim, which is: What were the terms of the oral agreement reached by Lotzer and Winter? More specifically: Did their agreement require the use of union subcontractors? Because all of Winter & Associates' state-law claims—including its claim for breach of contract—require a determination of the parties' agreement, those claims are preempted by § 301(a). Winter & Associates' claim for breach of contract will be analyzed under federal common law. Its claims for promissory estoppel and various forms of misrepresentation must be dismissed.

## C. Claim for Breach of Contract

■ The Trades Council argues that it must be granted summary judgment on Winter & Associates' breach-of-contract claim because the Trades Council did not breach the targeting agreement. According to the Trades Council, Winter and Lotzer's oral agreement included a condition that Winter & Associates exclusively employ union subcontractors. The Trades Council argues that Winter & Associates failed to live up to its end of the bargain and, thus, it cannot recover for breach of contract. Winter & Associates' response to this argument is simply that there is a dispute of material fact regarding the terms of the targeting agreement. Construing the evidence in the light most favorable to Winter & Associates, and granting Winter & Associates the benefit of all favorable inferences, the court finds that Winter & Associates has failed to establish that such a dispute of fact exists.

Winter & Associates has presented no evidence to rebut the Trades Council's assertion that, prior to February 19, 1996, Winter and Lotzer had orally agreed that the Trades Council would provide target funds only if Winter & Associates used solely union subcontractors. Lotzer testified that on two occasions, October 18, 1995, and January 9, 1996, he and Winter discussed the union subcontractor require-

ment of the targeting agreement, and that Winter agreed to this condition for the funding. According to the undisputed evidence in this case, as of January 9, 1996, the Trades Council and Winter & Associates had an oral contract requiring Winter & Associates to use only union subcontractors.

What Winter & Associates seems to be suggesting is that Lotzer waived the union subcontractor requirement at the meeting or meetings held on February 19. "[W]aiver in contract law is the intentional relinquishment of a known right." *Sethness–Greenleaf, Inc. v. Green River Corp.*, 65 F.3d 64, 67 (7th Cir.1995). "[W]aiver is frequently limited to minor conditions." *Bank v. Truck Ins. Exch.*, 51 F.3d 736, 739 (7th Cir.1995) (citing 2 E. Allan Farnsworth, *Contracts* § 8.5, pp. 378–79 (2d ed.1990)). "Unless the right waived is a minor one . . ., why would someone give it up in exchange for nothing?" *Id.* In this case, Winter & Associates suggests that Lotzer waived one of the most significant conditions of their agreement.

Winter & Associates presents two pieces of evidence that might support a theory of waiver. First, in Winter's deposition testimony regarding his discussions with Lotzer on February 19, Winter states that Lotzer failed to mention that union subcontractors were required under the targeting agreement. Second, Larson (the president of Midstate) stated in his deposition, that at the February 19 meeting, "[Lotzer] said that he would contribute or that they would contribute $45,000 to this project if Steve Winter hired a union contractor." (Koehler Aff., Larson Dep. at 85.)

That evidence is too slim to support a finding of waiver. The Trades Council is not an eleemosynary organization; it exists to promote and protect the interests of its members. The targeting funds provided by the Trades Council were presumably derived from the dues of union members who clearly do not want such money spent on nonunion projects. Based on the evidence presented here, the court finds it inconceivable that the Trades Council intended to give up the union subcontractor requirement. The fact that Lotzer may have failed to mention the union subcontractor to Winter on February 19 means little; it is not surprising that Lotzer would not feel obligated to reiterate a contract provision that was so clearly articulated in their previous discussions. As for Larson's testimony, Larson stated that the purpose of his meeting with Lotzer and Winter was to approve Midstate as general contractor for the project; there is no evidence to suggest that the purpose of the meeting was to discuss the terms of the targeting agreement. In the context of such a meeting, it is too far-fetched to suggest that the parties understood Lotzer's statement—or in this case, lack of a statement—to amount to a waiver of such a critical term of the contract.

The actions of Winter and Lotzer after February 19 belie any notion that either party thought the union subcontractor requirement had been waived. Lotzer called Winter on March 18 to inform him that Midstate was violating the agreement by hiring nonunion subcontractors and Winter made no effort to challenge Lotzer about the continuing validity of that requirement. In addition, Winter's letters to Midstate of May 9, 1996 and November 19, 1996, make it clear that Winter understood there was still an obligation to use union subcontractors on the project. If Winter believed the union subcontractor requirement had been waived, such statements would have been unnecessary.

A mere scintilla of evidence is not sufficient to preclude summary judgment. *See Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir.1996). In this case, the slender evidence presented by Winter & Associates is not sufficient to withstand summary judgment.

## IV. CONCLUSION

The motion by plaintiff Rollie Winter & Associates to remand this action to state court is **DENIED**.

The motion for summary judgment by defendant Fox River Valley Building & Construction Trades Council is **GRANTED.** All claims by defendant Rollie Winter & Associates, Ltd., are **DISMISSED.**

**SO ORDERED.**